## The C. & C. Brooks.

*(District Court, D. New Jersey.   July 26, 1883.)*

1. **SALVAGE SERVICE—TOWAGE—UNCONSCIONABLE CONTRACT.**

    A schooner of 135 tons, worth about $2,000, with a cargo of the value of $400 or $500, was leaking badly on the high seas from the effect of a collision with a vessel that had afterwards abandoned her, but was not derelict.   Her crew was tired out by pumping and long watchings; she was making very little progress, and with a change of wind was gradually working seaward, when a tug came to her and towed her up the bay to Jersey City, where she was left, at the request of her master, on the flats, consuming in so doing about four hours.   *Held*, that this was a case of salvage service of low grade, involving no circumstances which would justify the court in making large compensation; that a contract to pay $1,000 for such service was unreasonable and would not be enforced; but that $250 and the costs of the proceeding would be allowed for the towage and salvage service.

2. **SAME—CONTRACTS, WHEN ENFORCED.**

    Contracts made for salvage service and salvage compensation will be enforced when the salvor has not taken advantage of his power to make an unconscionable bargain; but the courts will not tolerate the doctrine that a salvor can take advantage of his situation and avail himself of the calamities of others to drive a bargain; nor will they permit the performance of a public duty to be turned into a traffic of profit.

In Admiralty.   Libel *in rem.*

*Samuel H. Valentine,* for libelants.

*Bebee & Wilcox,* for claimants.

NIXON, J.   This is a libel *in rem,* and the claim is for $1,025 for a towing and salvage service rendered by the libelants.   The libel sets forth that on the twenty-ninth of November, 1877, the schooner of the respondents was on the high seas, east of the Highlands, in a sinking condition, and with a flag of distress flying at her mast-head; that libelants' tug, seeing her in this condition, steamed along-side, and the master of the schooner requested the master of the tug to make fast and tow her into the port of New York; that the request was complied with, and the tug towed the schooner, with a hawser, up the bay to Jersey City, and, at the request of the master of the

schooner, left her on the flats there; and that for said service the master of the schooner agreed with the master of the tug to pay him the sum of $1,000. The libelants also claim the additional amount of $25 for the use of the hawser in towing. The answer of the claimants admits the towage, but denies that the schooner was in a sinking condition, or that her captain agreed to pay $1,000, or any other definite sum, for the service. The answer further alleges that, previous to the time of being taken in tow by the tug, the schooner had met with a collision with the United States torpedo boat Alarm, which caused her to leak, and disabled her, but as she was laden with a cargo of wood she was buoyant and not in a sinking condition; that the Alarm remained by the schooner for some time, and then left her, her master promising to send a tug to tow her into port; that the crew of the schooner remained aboard, and that by the use of her sails she was slowly working her way into port, and had proceeded about 20 miles when she was hailed by the tug-boat Hudson, whose master offered his services to tow her into the port of New York, which service was accepted, and the said schooner thereafter towed into New York by said tug, being engaged in said service from 3 o'clock P. M. to 7 o'clock P. M.; that the towing was performed under circumstances of no unusual risk, danger, or effort; and that the claimants had always, and were now, ready and willing to pay a reasonable amount for the services rendered by the tug.

The first question is whether the help rendered by the libelants' tug was a mere towage service, or whether it also embraced any of the elements of a salvage service. The schooner was not derelict, but she was leaking badly, and her crew was tired out by pumping and long watching. She had made small progress since she had been abandoned by the Alarm in the early part of the day. The best evidence of her semi-helpless condition is found in the fact that she had kept her flag flying union down during the day, and that the libelants were attracted to her by observing the signal of distress. I lay some stress, also, upon the proof that the captain of the schooner stated, after his arrival in Jersey City the same evening, that if the tug had not come to their relief there was danger of the loss of the vessel and crew. It must not be overlooked in this connection that just before the Hudson reached the schooner the wind changed from the south to the north-north-west; that a stiff breeze was blowing; and that the vessel was gradually working seaward. I am of the opinion, from the testimony, that it was a case of salvage service, but one of a low grade, and involving no circumstances which would justify the court in making large compensation.

The next inquiry is, was there a contract between the parties for the towing, and, if so, was it reasonable in its terms and character? The weight of the evidence is in favor of the existence of a contract. The master of the schooner denies it, but his denial is apparently based upon the fact that he did not in express terms agree to the

proposition of the master of the tug to pay the $1,000. He admits that when the latter told him that he should charge $1,000 for the service, and hold the schooner liable for its payment, he responded: "It don't make any difference; I want you to take hold of her and tow her up." He further states, in a subsequent part of his examination, that when the captain of the tug said he wanted $1,000 for towing her to New York, he made no objection, but told him to take a hold and tow her, and gave him a hawser. But did the circumstances of the case at the time render such charge reasonable and proper? Courts of admiralty look upon salvage contracts with great care, and will not be controlled by them when any advantage has been taken of the necessities of the party in need of help. The supreme court, in *Post* v. *Jones*, 19 How. 160, said:

"Contracts made for salvage service and salvage compensation will be enforced when the salvor has not taken advantage of his power to make an unconscionable bargain; but they [the courts] will not tolerate the doctrine that a salvor can take advantage of his situation and avail himself of the calamities of others to drive a bargain; nor will they permit the performance of a public duty to be turned into a traffic of profit. The general interests of commerce will be much better promoted by requiring the salvor to trust for compensation to the liberal recompense usually awarded by courts for such services."

The late Justice STORY, in *The Emulous*, 1 Sumn. 210, thus states the law:

"Contracts made for salvage services are not ordinarily held obligatory by the court of admiralty upon the persons whose property is saved, unless the court can clearly see that no advantage is taken of the parties' situation, and that the rate of compensation is just and reasonable."

Then, after stating that the doctrine is founded on principles of sound policy, as well as upon just views of moral obligation, he adds, with almost indignant emphasis:

"No system of jurisprudence, purporting to be founded upon moral or religious or even rational principles, could tolerate for a moment the doctrine that a salvor might avail himself of the calamities of others to force upon them a contract unjust, oppressive, or exorbitant; that he might turn the price of safety into the price of ruin; that he might turn an act demanded by Christian and public duty into a traffic of profit which would outrage human feelings and disgrace human justice."

Applying these principles to the case under consideration, I think the court ought not to sanction the contract. It was unreasonable and the charge exorbitant. The schooner doubtless needed help, and an allowance ought to be made, liberal enough to induce masters of other tugs, who are not moved to help their fellow-men, when in distress, by motives of sympathy, to do so from motives of compensation and gain. If the schooner and crew were in no peril, $50 would be ample pay for the few hours' towage which was rendered. If they were in peril, as the libelants stoutly contend, can anything be conceived more heartless than the master of the tug refusing all aid un-

less the master of the schooner would agree to pay nim $1,000 for rescuing him and his vessel and cargo from danger? The registered tonnage of the schooner was 135 tons, and she was 12 years old. The witness valued her from one thousand two hundred and fifty to five thousand dollars. I think that $2,000 is a fair valuation of her after the collision and before she was repaired. The cargo not jettisoned was probably worth four or five hundred dollars more. No exposure, risk, or danger of any sort accompanied the service of the libelants. Under the circumstances, $250 is a liberal allowance for the towage and salvage services, and a decree will be entered for that amount. As no proof of the tender of any sum by the respondents has been made, the libelants are entitled to their costs.