## THE SIRIUS.

### CEDROS ISLAND MIN. & MILL. CO. (LOWE et al., Interveners) v. THE SIRIUS.

#### (District Court, N. D. California. January 3, 1893.)

#### No. 10,292.

1. SALVAGE—CONTRACT FOR TOWAGE—DURESS—AMOUNT OF COMPENSATION.

On a libel on contract for salvage services rendered by the steam schooner Tillamook to the steamer Sirius, the evidence showed that the Sirius, having lost her propeller and part of her shaft, was placed under such sail as she had, and, after drifting for three days, was anchored in a bay of an island off the coast of lower California; that she was in a dangerous position, as she could not get an offing with her small sail power, and in case of a southerly gale might go ashore; that the master of the Tillamook, which came to her assistance, proposed either to tow her to San Diego for $20,000, or to furnish stores and gratuitously take an officer to San Diego to procure assistance; that the original purpose of the master of the Sirius was to send to San Diego for assistance; that he was positive his position was safe, and that he could get to sea before a southerly storm became dangerous; that he decided not to send an officer to San Diego, as he wished to avoid lengthening his voyage; that he claimed that $20,000 for the towage services was unreasonable and exorbitant, and proposed either a reduction in the charge, or arbitration, or to leave the question to the owners to settle; that his propositions were rejected by the master of the Tillamook, whose vessel, with its small engines, might become disabled or too greatly strained by towing the Sirius, which was much larger; that the negotiations occupied an hour and a half; that the contract for the towage services at $20,000, contingent on success, was drawn by the purser of the Sirius, and subsequently signed by her master; and that the Tillamook was valued at $32,000, and the salved property at $143,539. *Held,* that the situation of the master of the Sirius did not force him into the agreement, and the contract was not made under duress; and that the compensation provided for the service, though high, was not so unreasonable in amount as to justify the court in setting the contract aside as wholly inequitable and unjust. The Wellington, 48 Fed. Rep. 478, and The Agnes I. Grace, 51 Fed. Rep. 958, 2 C. C. A. 581, followed.

2. SAME—APPORTIONMENT.

The award of $20,000 under the contract was distributed among the salvors by the court as follows: $13,250 to the charterers of the Tillamook, which was the principal factor in performing the salvage services, and assumed the risk of failure and disaster; $2,500 to the master of the Tillamook, who promptly procured additional stores for the Sirius, offered to go to San Diego at once for assistance, and undertook the towage service against the protest of two of his passengers; and $4,250 to the other officers and crew of the vessel, according to their relations to the service performed, their extra work, and their regular wages.

In Admiralty. Libel by the Cedros Island Mining & Milling Company against the British steamer Sirius, her freight and cargo, upon a contract for salvage. Decree for libelant.

George Fuller and Walter G. Holmes, for libelant.
H. W. Hutton, for interveners.
Andros & Frank and Page & Eells, for claimants of the cargo.
E. W. McGraw, for claimant of the steamer and freight.

MORROW, District Judge. This is an action upon a contract for a salvage service, rendered to the British steamer Sirius by the American steam schooner Tillamook. On the 20th day of February, 1892, the steamer Sirius, then on a voyage from Central American ports to San Francisco, and while off the coast of lower California, lost her propeller and part of the shaft at a point about 45 miles northward of Cerros island (sometimes called "Cedros" island.) The vessel was steaming northward at the time of the accident. The weather was pleasant, with the wind light from the northwest. The vessel was placed under such sail as she had, and, after drifting about for three days, she was anchored in South bay, at the south end of Cerros island, having returned south on her course about 75 miles. Cerros island is 25 miles in length, extending along the coast of Lower California, and is under the jurisdiction of Mexico. It is about 60 miles due west from the mainland, but a point of the mainland makes up from the south to within 12 miles of the south end of the island. To the west of Cerros island, and at a distance of about 15 miles, are the small islands of San Benito. Vessels making voyages up or down the coast may pass inside, between Cerros island and the mainland, or between Cerros island and the San Benito islands, or entirely outside and west of the latter islands.

When the steamer Sirius came to anchor at South bay, the steam schooner Tillamook, under charter to the libelant, was lying at anchor near a mining camp at the northeasterly end of Cerros island about 30 miles by sea from South bay. The Tillamook was a freight vessel, but at this time she appears to have been carrying passengers from San Diego to the mining camp on the island, and return by way of Ensenada, in Lower California. Ensenada is the port of entry for Cerros island, and vessels making voyages from the latter place to San Diego are required to clear from Ensenada. The Tillamook usually made the voyage from the mining camp to Ensenada, a distance of 237 miles, in 30 hours, and from Ensenada to San Diego, a distance of 60 miles, in 8 hours. The next morning after the Sirius came to anchor in South bay, the master sent the purser, Mr. Brewster, in a small boat up to the mining camp, expecting to find a steamer there by which information could be sent to San Diego concerning the condition of the Sirius and her need of assistance. The purser of the Sirius reached the Tillamook about 4 o'clock on the afternoon of February 24th, boarded her, and reported to her master, Capt. Hamm, that the Sirius was at South bay in distress, with her shaft broken, propeller lost, short of stores, and in need of assistance. Capt. Hamm and the purser proceeded ashore, and procured suitable stores, which they placed in the boat, intending to send the

boat with the stores back to South bay in the morning. The stores consisted of two barrels of beef, 3 1-4 bags of flour, 2 bags of potatoes, and 1-2 box of tobacco, and were intended to last the Sirius for 10 days. It appears that there were passengers at the mining camp whom Capt. Hamm desired to consult before he could determine what he could do in the way of rendering assistance to the Sirius. He appears to have seen two of them, who protested against the use of the Tillamook in rendering such assistance, as it would delay their return to San Diego. The next morning, February 25th, Capt. Hamm concluded that it would be too hard a pull for the men to return in the small boat, and accordingly he took them, with their boats and stores, on board the Tillamook, and steamed down to South bay, where they arrived about noon. Capt. Hamm went at once on board the Sirius, and was introduced by the purser to Capt. Gregory, the master. A conversation followed between the two masters concerning the towage of the Sirius by the Tillamook to San Diego. The negotiations finally terminated in the following written agreement:

"S. S. Sirius, February 25th, 1892.

"It is hereby agreed between Captain H. S. Hamm, captain and master of S. S. Tillamook, and Captain H. M. Gregory, captain and master of Br. S. S. Sirius, that the master of the steamship Tillamook will tow the S. S. Sirius to a safe anchorage in the harbor of San Diego for the sum of twenty thousand dollars U. S. gold coin, to be paid in San Francisco by said master of S. S. Sirius on account of owners.

"H. S. Hamm, Master of S. S. Tillamook.
"H. M. Gregory, Master of S. S. Sirius.

"Witness:
"Benj. Harrison.
"D. G. Brewster.

"All coal and necessary help to be furnished by the S. S. Sirius."

This agreement was executed in triplicate; the captain of the Tillamook taking two copies,—one for the owners of the vessel, and one for the charterer. The other copy was taken by the master of the Sirius. The Tillamook thereupon furnished a hawser to the Sirius, and, taking that vessel in tow, at about 2 o'clock in the afternoon, steamed up to the anchorage near the mining camp at the north of the island, where the Sirius was anchored, at about 7 o'clock and 20 minutes in the evening, and the two vessels remained over night, the Tillamook going alongside of the Sirius, and taking 17 tons of coal from the latter as a precautionary measure in case of bad weather, and then standing by with steam up the remainder of the night. The next morning, February 26th, the Tillamook took on board 18 passengers, and, again taking the Sirius in tow, proceeded to San Diego, where the vessels arrived, and the Sirius was safely anchored, on the morning of March 1st. The voyage from the anchorage near the mining camp on Cerros island to San Diego had occupied about 93 hours or a few hours less than 4 days. The Tillamook having performed her part of the contract, the libelant, at San Francisco, demanded of the master and agents of the owner of the Sirius the sum agreed upon to be paid for the service rendered, and payment was refused. The Sirius is an iron steamer, 852 tons register, 258 feet in length, 26 feet beam, with 2 masts, a foresail, fore-topsail, and fore and mainstay

sails, but no mainsail. The vessel was valued at $30,000, her cargo at $112,000, and her freight money amounted to $1,539; total value of salved property, $143,539. The Tillamook is a wooden steam schooner, 209 tons register, 126 feet in length, 32 feet beam. Her value was $32,000. The foregoing statement constitutes the principal facts in the case, about which there is no controversy.

The agent of the owner, in his answer to the libel, denies his obligation upon the contract, and alleges that the facts connected with the service of the Tillamook were as follows:

"On the 25th day of February, 1892, the steamer Sirius, with a broken shaft, her propeller lost, and thereby disabled, was lying safely at anchor at Cedros island. With the winds then prevailing she could have lain there safely for all time to come. She had on board a valuable cargo. A change of wind to the southward might have placed the ship and her cargo in a precarious and dangerous position, either driving her ashore, or forcing her to put to sea, to drift before the wind. It would have taken considerable time to procure assistance from San Diego, which was the nearest port at which a tug could be found. Under these circumstances the master of the Tillamook demanded and insisted that the master of the Sirius should contract to pay him the sum of $20,000 for towing the Sirius to San Diego, and absolutely refused to tow the Sirius unless such contract was made. The said master of the Sirius remonstrated against said demand as exorbitant and unjust, but the master of the Tillamook refused to undertake the service for a less sum, and threatened to leave said steamship Sirius where she lay unless his said demand was acceded to; and therefore the master of the Sirius, realizing that said steamer, by reason of the loss of the propeller, and of the fact that she had only limited sailing powers, her distance from other assistance, and by reason of the fact that she was lying on a roadstead open to the southward, was in a position which with a change of wind might be dangerous, and that, by remaining in said position until other assistance could be procured, the lives and property on board might possibly be endangered or lost, solely for the purpose of avoiding any further risk, and because of the compulsion placed on him, agreed in form with the master of the Tillamook to pay the demand aforesaid; but this claimant avers that said agreement was forced upon said master of the Sirius as aforesaid, and that it was not voluntarily made, but was made under duress, and that the same was and is void."

The amount specified in the contract for the service rendered by the Tillamook appears large, as viewed now, in the light of the favorable circumstances under which the service was performed, but this fact alone is not sufficient to set aside the contract as void. In The Helen and George, Swab. 368, Dr. Lushington stated the rule respecting contracts for salvage service as follows:

"The principle on which the court acts is that, if satisfied that an agreement has been made, it will carry it into effect unless totally contrary to justice and the equity of the case; but the owner of the ship against whom the agreement is attempted to be enforced may show that it was improperly obtained. The owner may contend that, under the circumstances, the sum of money was grossly exorbitant, and a fortiori, if he can show that the agreement was obtained by fraud or compulsion, no court would hold it to be binding; but, when the execution of such an instrument is once proved, it is prima facie binding, and the burden of proof falls on those who dispute the validity of the instrument."

This case was recently cited and followed as authority by the circuit court of appeals for the fifth circuit, in the case of The Agnes I. Grace, 51 Fed. Rep. 958, 2 C. C. A. 581. It was also cited by the supreme court in the case of The Tornado, 109 U. S. 110–117, 3 Sup. Ct. Rep. 78, where it was said that "every agreement for salvage

compensation is subject, as to amount, to the judgment of the court as to its being equitable and conformable to the merits of the case." It will be observed, however, on examination of the last case, that this brief sentence was intended only as a reference to the rule stated in the opinion of Dr. Lushington and by the other authorities cited. The question involved in the case did not require anything more.

In Post v. Jones, 19 How. 150–160, a rule is stated respecting contracts for salvage service which, although not necessary to the determination of that case, has been frequently referred to as an authority in this class of cases. It is as follows:

"Courts of admiralty will enforce contracts made for salvage service and salvage compensation where the salvor has not taken advantage of his power to make an unreasonable bargain; but they will not tolerate the doctrine that a salvor can take the advantage of his situation, and avail himself of the calamities of others to drive a bargain, nor will they permit the performance of a public duty to be turned into a traffic of profit."

In the case of The Wellington, 48 Fed. Rep. 478, Judge Ross, sitting in this court, said: "No one doubts that, when the circumstances of a case render such action proper, a court of admiralty will refuse to enforce a contract made for salvage services;" but he held that, although the sum of $15,000, stipulated in the contract then under consideration, was undoubtedly too large for the service in that case, he did not think it was so exorbitant as to justify the court in setting aside the contract thus made. Without further discussing the authorities on this subject, we will now proceed to consider the testimony, for the purpose of determining the situation of the parties and the circumstances attending the making of the contract in the present case.

In the testimony of Capt. Hamm, of the Tillamook, the transaction is related as follows: After referring to the arrival of the purser of the Sirius at the anchorage near the mining camp asking for assistance, and the departure of the Tillamook the next morning for South bay, he says:

"I reached South bay, where I lowered the boat down,—the boat of the Sirius, not my own boat. I turned my vessel over to my chief officer, went aboard the Sirius, and saw Captain Gregory. We had a few words, talking, and he asked me the price. I said: 'My vessel is too small to tow you up. I do not know if I can do it. If I have to charge, I have to charge that price, which is $20,000;' but I said: 'If you do not want to do that, we will leave that over to the court, and let the court decide what price I shall have.' But he declined. He said: 'No; what other offer can you give me.' I said: 'I will give you more stores from Cedros island, and then I will take your purser or mate, or whoever you want me to take, and go up to San Diego or Ensenada, where you can telegraph and call for assistance.' During that time he told me that I should wait an hour or so, so that he could write letters to his owners. I told him I would do so. I went out of his room, and I stayed for an hour and a half talking to my engineer, who was now on board the steamer Sirius. He was previously on board the Tillamook,—Mr. Harris. In an hour's time Captain Gregory called me in, and said he agreed to take that tow for the amount I said. He drew up the agreement personally,—that is, the purser did. He was standing on one side, and I was standing on the other. Question. How many copies were drawn? Answer. I drew three. Q. You drew them, or he? A. The purser did. I demanded three,—one for my owners, one for my charter party, and one that the captain could keep personally. He signed all three."

The agreement having been identified, the witness is asked:

"Following the signatures, captain, are these words: 'All coal and help necessary to be furnished by the steamship Sirius without charge?' Answer. It was. Question. I will ask you if that was an afterthought, or what? A. No, sir; we agreed to that, but the purser kind of neglected to put it in until I signed my name. The captain was very willing to come to that. Q. Then this coal and help branch of it was part and parcel of the proposition before it was drawn up? A. Yes, sir. Q. It was simply omitted by the purser in drawing the body of it, and afterwards appended? A. Yes, sir."

The witness was cross-examined very closely as to the conversation that took place between himself and Capt. Gregory prior to the signing of the towage agreement. At first he omits to mention the proposition, which he claims to have made, to leave the matter of compensation to the court, but, being pressed to repeat all that was said, he recalls it, and states it as follows:

"Before we signed the agreement, he asked me if I would leave this $20,000 business, and not charge and take the vessel up and leave it to arbitration. I told him no; I would leave it to the court. Q. When was this? A. Just before the agreement was made. Q. He asked you, then, if you would leave it to arbitration? A. Yes, sir. I told him I would take the vessel up as good as I could, and leave it to the court."

Later on, the witness was further cross-examined as to what he had said to the attorneys on this subject, and particularly as to the time when he first told them that he suggested to Capt. Gregory to leave the compensation for the towage service to the court. In reply to this inquiry he stated that he told Mr. Fuller about it at San Diego on the 1st of March. This was the same day that the Tillamook arrived at San Diego with the Sirius in tow, and before any controversy arose as to the payment of the amount provided in the agreement. Mr. Fuller was the attorney for the libelant, and was present in court during the trial of the case, but was not called by the respondents to confirm or contradict the statement made by Capt. Hamm. The foregoing testimony was delivered in court on the 28th day of April, 1892.

The deposition of Capt. Gregory was taken on the 21st day of April, 1892, or just a week previous to the trial. He relates the conversation between himself and Capt. Hamm as follows:

"I had a conversation with Captain Hamm in my own room in the presence of the purser, in which I asked him what he was going to charge me to take me to San Diego. He informed me $20,000. I told him the price was exorbitant, and asked him if he would make any reduction in it. He told me he would not. He said, '$20,000 or nothing.' I then asked him if he would submit the matter to arbitration. He refused. I asked him if he would submit it to the owners to settle. He refused. He informed me that he had no time to talk to me; that he wanted to get back to the mining camp, and said if I did not talk quick he would leave. I then asked him if he would take an officer up to San Diego with him when he went, and he said he would. Question. That is, in the event of leaving you? Answer. Yes, sir; in the event of leaving me he said he would. He left my room, and started for his boat. Seeing that he was determined to leave me, I called him back, and told him I should be obliged to accept the service, and to give me a tow line. Q. A tow line was then passed? A. Yes, sir; it was then passed. Q. At what time? A. It was about five minutes before noon."

The witness makes no mention of the written agreement, and evidently seeks to convey the impression that the whole transaction

occupied but a few minutes, which he fixes as a point of time at five minutes before noon.

On cross-examination the witness is asked:

"Why did you not take advantage of the offer of the master of the Tillamook to send an officer to San Diego to allow him to negotiate for some one else? Answer. On account of the loss of time. Question. Is that the only reason? A. Yes, sir; that is the only reason. Q. There is no other reason? A. No, sir; except to get my ship out of that position. In case southerly weather came up, I would have been compelled to go to sea. I would not have lost my ship, because I would have gone to sea upon the first indication of bad weather. Q. One of the reasons, if I understand you, for not taking advantage of that offer, was the danger of southerly winds while lying at the place you call 'South Bay?' A. Not so much that, as to avoid lengthening my voyage. I should have gone to sea there at the first indication of any southerly weather. Q. Had you sail power sufficient to go to sea in a southerly storm? A. Yes, sir; I would have to go to sea at the very first indication of bad weather. A southerly storm always gives some indication beforehand. Q. Had you sail power sufficient to go to sea? A. Yes, sir; I could have drifted about, and made my way into Magdalena Bay."

Mr. Brewster, the purser of the Sirius, in his deposition, also taken on the 21st day of April, 1892, testifies concerning the interview between the two captains as follows:

"They shook hands, and after I had introduced Captain Hamm he says: 'Well, you want a tow?' Captain Gregory says: 'Yes.' Captain Hamm says: 'I will tow you for $20,000.' Captain Gregory says: 'That is an outrageous price. Can't you tow me any cheaper than that?' Captain Hamm says: 'No; not a cent cheaper.' Captain Gregory says: 'Will you leave it to arbitration in San Francisco?' Captain Hamm says: 'No.' Captain Gregory says: 'Will you submit it to our own owners, and allow them to settle it?' Question. That is, to the owners of both ships? Answer. Yes, sir; to the owners of both ships. Captain Hamm says: 'No; I wont.' He says: 'I have not got much time; you must hurry; I am going to get out. I will take the purser to San Diego if he wants to go, but I have to get out, and I want you to hurry up, too.' Captain Hamm then left the room, and Captain Gregory considered the matter awhile, and called him again, and almost precisely the same language was used, and finally Captain Gregory instructed me to draw up an agreement. Q. Was such an agreement drawn? A. Yes, sir. Q. Was it signed? A. Yes, sir. Q. And taken by Captain Hamm? A. Yes, sir; taken by Captain Hamm,—two copies by him, and one copy by Captain Gregory. Q. Then did the Tillamook pass her line over? A. Yes, sir. Q. And you started in to tow? A. Yes, sir."

On cross-examination, this witness was asked—

"What Captain Gregory said, if anything, when Captain Hamm offered to take the witness on his return, so that he could get such assistance as he chooses. Answer. He said he wanted to have a minute by himself, so he could converse with me about the matter, I being purser and one of the officers, and he and I were talking about the matter. Question. Did he have a few minutes conversation with you? A. Yes, sir. He asked me, as I had seen the San Diego papers which I got from the Tillamook, about the sailing of different ships. Q. And he rejected that offer subsequently? A. Yes, sir. He naturally rejected the offer for me to go by the Tillamook, because he took the tow. Q. Did he say anything, in that conversation to you, about it being best to accept that offer because there was danger in lying at South bay in case of a southerly storm? A. He did not say anything of the kind. It was simply a question of getting that ship and cargo to port as quickly as possible. He said it was an outrage, with the usual language and slang of a sailor's vocabulary that they generally indulge in. * * * Q. You spoke of having received San Diego papers from the Tillamook? A. Yes, sir. Q. What had their contents to do with your going to San Diego on the Tillamook for assistance? A. We found out that the sailing days of the Newbern had changed, and also the City of Panama, the

slow steamer. We generaly know the captains of the different steamers, and how they generally take the coast. This steamer generally kept outside. Q. Could you have got assistance at San Diego? A. Yes, sir."

Referring again to the deposition of Capt. Gregory, we find that on cross-examination he was asked about the probability of obtaining assistance from one of these passing steamers, as follows:

"Question. When Captain Hamm declined to assist you for a less price than $20,000, why did you not reject that offer, and patrol the passages inside, and the same outside, hoping to get a passenger steamer that would not make such a charge? Answer. For the reason that the Newbern was the only steamer passing down, and her sailing days had been changed from the 25th to the 1st of the month, and for the reason that I knew the Panama, or, rather, I was told that she went a long distance outside of the Benito islands. Those were the only two ships then due for some time. Q. Do the Panama steamers go inside or outside? A. As a rule, outside the Benito islands. Q. Is the Cerros island one of the Benito islands? A. No, sir. Q. Where are they? A. I think they are 12 or 15 miles outside of the Cerros islands. To have intercepted her I would have been obliged to risk an open boat at sea for an indefinite length of time."

Capt. Gregory was also called as a witness at the trial, and, after identifying his position at South bay on a map, and declaring that he could have got out of there in a southeast wind "unless the gale had come on butt end first, which happens only phenominally," was again asked about the interview with Capt. Hamm, and for the first time his attention is called to the written contract, which at that time had been read in evidence. He repeats substantially his former testimony down to the point where he says Capt. Hamm left his room or cabin, and then he adds the following:

"I then turned to the purser and consulted with him about the matter. We concluded that under the circumstances there was nothing to do but to accept his terms. There was no talk made at any time about referring the matter to the court, or anything of the sort. Of that I am strongly positive. It was declined on arbitration. There was but one question that I was allowed to discuss, and it was $20,000 or nothing. On that point I am positive. * * * Q. If he had proposed to submit that matter to the court, would you have accepted that proposition? A. I don't know whether I would or not, because the court awards upon it anyway; almost in every case of salvage it always comes before the court as a rule. It is a predisposed case that the court is the party that finally awards it; therefore it was not necessary to agree."

On cross-examination the witness was asked how long Capt. Hamm was on board his vessel.

"Answer. I cannot tell you now. My log book will show about the time he arrived on board and took my hawser. I think he came on board a little before 12 o'clock, and I think it was 1:58 when he took my hawser. Question. How long a time elapsed between the time he left your vessel and this agreement was signed, and the time he took the hawser? A. I should suppose 20 minutes or a half an hour. Q. He was on board your vessel about an hour and a half? A. Somewhere in that neighborhood,—more or less. I would not specify the exact minutes. I did not time the moment he entered my room and the moment he left."

Mr. Brewster, the purser, was also called and testified upon the trial, repeating substantially what he had said in his deposition concerning the interview between the two captains. Being asked, on cross-examination, how long was the conversation between Capt. Gregory and the witness in considering this offer, he says:

"It must have been 15 or 20 minutes. During that time the captain concluded at one time he would not take the tow. I went to my room to pack my valise to go to San Diego on the Tillamook."

Does this testimony establish the defense made by the owners of the ship and cargo,—that this agreement was forced upon the master of the Sirius, and was therefore made by him involuntarily and under duress? In determining this question, it is contended on the part of the defense that the proposition claimed to have been made by Capt. Hamm, to leave the question of compensation to the court, must first be eliminated, because Capt. Gregory and Purser Brewster have testified that the proposition was not made; but the importance of assuming that this proposition was not submitted to Capt. Gregory is very much lessened by the fact that the latter, while denying the offer, does not say it would have been accepted if made. His testimony indicates very clearly that to him the terms offered would not have been less oppressive if this proposition had been made, since in his opinion the submission of the question to the court was open to him in any event. We are dealing now not only with the actual situation, but also with the state of mind under which Capt. Gregory was acting when he signed the agreement. He knew that, in the event the owners of the ship and cargo were not satisfied with any agreement he might make, his situation was available to them as a defense to any action that might be brought upon the contract, and in such case he doubtless assumed that the award of the court would not be greater, but might be less, than the amount of compensation stipulated in the contract. There was therefore an advantage in a written agreement which practically fixed the maximum limit to the compensation, over an agreement to submit the question directly to the court without such a limitation. Capt. Gregory was seeking the best terms he could get. Capt. Hamm proposed (1) to tow the Sirius to San Diego for $20,000; (2) to furnish more stores, and take an officer to Ensenada or San Diego for assistance. About these two propositions there is no question, and under the circumstances we may dismiss further consideration of the offer of Capt. Hamm to leave the question of compensation to the court. Capt. Gregory proposed (1) reduction in the charge; (2) arbitration; (3) to leave the question for the owners to settle. These being rejected, it was then for him to determine which one of Capt. Hamm's propositions he would accept. It appears to have been his original purpose to send to San Diego for assistance. In his deposition he was asked this question by his counsel:

"Question. After dropping your anchor, what measures did you take to secure the protection or relief of the vessel from her condition? Answer. By sending a boat next morning at daylight to the mining camp, where I expected we would find a steamer by which I could have got information to San Diego."

He did not, therefore, expect the Tillamook to come to his assistance at South bay, but to take a message for him to San Diego, where assistance could be procured, and where the owner could have been informed by telegraph as to the condition of affairs. He says he was perfectly safe where he was at South bay unless a southerly wind had sprung up, in which case he would have gone to sea, and

proceeded on his course to San Diego. Capt. Gregory's original purpose to send to San Diego for assistance was therefore, under the circumstances, a reasonable and proper course to pursue, and we are not surprised to find him still entertaining that view during the pendency of negotiations with Capt. Hamm, when at one time he determined not to take the tow, and the purser packed his valise to go on the Tillamook to San Diego. It will be observed that Capt. Hamm proposed to assist in carrying out this purpose, and he would do it without charge. Moreover, he would proceed at once on his return, that there might be no ·delay in securing the necessary assistance. He would also have secured additional stores for the Sirius, so that there might be no danger of distress in that direction. There is certainly no evidence here that Capt. Hamm took advantage of his position to drive an unreasonable bargain, but, on the contrary, he appears to have been quite willing to render a service, deemed by Capt. Gregory sufficient for the occasion without any compensation whatever. Moreover, there was time given for deliberation, for the negotiations occupied about one hour and a half. But when Capt. Hamm came to make a bargain to use his own vessel for the purpose of towing the Sirius, he demanded $20,000 to tow that vessel to a safe anchorage in the harbor of San Diego, and this demand, it is claimed, was unreasonable and exorbitant. The explanation given for this charge is that the Tillamook was considered too small to take the tow. She was built for a freight boat and not for a towage service. Her engine was small, that there might be more room for freight, and, in towing a vessel of the size of the Sirius, the strain would be very great. The compensation was contingent upon success. The chance of failure and disaster to such a vessel would be much greater than in the case of a vessel of more power. It is true that, with favorable weather, the service was actually performed without much difficulty; but it required 93 hours to make the voyage from the anchorage at the mining camp to San Diego, a distance of about 300 miles, and in doing this the engineer testifies that an unusual strain was placed on the engine in the use of live steam in the low-pressure cylinder. In the case of bad weather there would have been great danger that the Tillamook would herself have become disabled and liable for a salvage service. This explanation appears satisfactory, particularly when it is coupled with the offer of Capt. Hamm to take an officer to Ensenada or San Diego to procure other assistance. Then why did Capt. Gregory submit to this demand which he denounced as unreasonable and exorbitant? His testimony is that he did not send an officer to San Diego because he wanted to avoid lengthening his voyage; in other words, he wanted to reach his port of destination as soon as possible, and he entered into the agreement with that object in view.

There is still another feature of this case to be noticed. It was established by a preponderance of testimony that the Sirius was really in a very dangerous position at South bay; that she could not get an offing with the sail power she had, and, in the event of a southerly gale coming up, she would inevitably have gone ashore. It appears, also, that she was surrounded by kelp, which added to the danger of

the situation. Capt. Gregory was, however, positive that he was in a safe position, and could get to sea before such a storm would become dangerous. His situation did not, therefore, operate to force him into an agreement with Capt. Hamm, but the actual fact, as disclosed by the testimony, may be taken into consideration in determining the value of the service rendered by the Tillamook. The testimony does not establish the claim that the contract was made under duress.

We come, now, to the final question whether, under all the circumstances, the amount charged was so exorbitant as to be totally contrary to the principles of equity and justice. In the southern district of New York it has been held that a salvage contract may limit the salvor, but has little or no binding effect upon the other party, and that a court of admiralty will refuse to enforce such a contract any further than is reasonable. The Schiedam, 48 Fed. Rep. 923; The G. W. Jones, Id. 925. The general rule, however, is to give effect to such a contract, free from fraud, and entered into by the parties freely and voluntarily, unless the compensation agreed upon is so exorbitant as to be wholly inequitable and unjust. In the case of The Agnes I. Grace, 49 Fed. Rep. 662, the value of the property saved was $12,030, after $1,200 had been expended in repairing the vessel. The contract provided for the payment of the sum of $5,000, or nearly 50 per cent. of the salved property for the salvage service. The court held—

"That a contract of this character is not binding upon the court, and that, in all cases of salvage it is competent for the court to adjudge and assess the amount of the recovery in accordance with the equities of the case; and, if it should appear that a contract of this character was an inequitable one, the court would, of course, disregard it. But wherever a contract has been entered into after due deliberation by the parties, and has not been shown to be in any respect an inequitable one, it is exceedingly valuable as evidence to enable the court to arrive at a just determination. The court regards this contract as evidence in that light, and not as a conclusive contract; but it is a most significant and valuable indication of what should be the true amount of the recovery."

In this case the court held that the contract stipulated but a moderate charge, and a decree was entered for the libelant for that amount. The claimants appealed to the circuit court of appeals, where the judgment and decree of the district court was affirmed. 51 Fed. Rep. 958, 2 C. C. A. 581. The appellate court did not, however, adopt the views of the judge of the district court as to the law of the case. It says:

"This case cannot be considered as belonging to that class of cases of contract for salvage services where the master, being upon the high seas or on an unhabited coast, at a distance from all other aid, is absolutely helpless, and without power to procure assistance other than that offered, and compelled in consequence to make a hard and inequitable contract. He was within easy reach of Savannah, where, had he desired to assume the risk for his owners, he could have procured lighters and other tugs to render the service."

The court then cites The Helen and George, Swab. 368, The British Empire, 6 Jur. 608, and The Wellington, 48 Fed. Rep. 478, referred to in this opinion, and says:

"Although the amount given may, under the circumstances, appear high in proportion to the value of the property saved, this court does not deem it sufficiently unreasonable to disturb the judgment of the court below."

As this is the law of this district, as declared in the case of The Wellington, supra, with the additional authority of having been recently affirmed by the circuit court of appeals for the fifth circuit in the case just cited, it will be accepted as declaring a rule applicable to the contract now under consideration; and, having determined that this contract was entered into by the parties freely and voluntarily, and without fraud or duress, it will be treated as binding, unless it appears that the compensation provided for the service is so unreasonable in amount as to justify the court in setting aside the agreement as wholly inequitable and unjust.

In the case of The Costa Rica, 3 Sawy. 610, that steamer was on a voyage from Panama to San Francisco. She became disabled, at 1 o'clock in the morning of October 26, 1874, by the breaking of the shaft of her propeller, when she was about 130 miles southward of San Diego, and about 25 miles off shore. Soon after the accident the mate was dispatched in a boat, with orders to proceed to San Diego, and thence telegraph to the agents of the Pacific Mail Steamship Company at San Francisco for assistance. At about noon of the same day, and while proceeding on his way, he was overtaken, when about four miles from San Diego, by the steamship Newbern. The mate was recognized by the officers of that vessel, and was taken on board. On being informed of the accident the master of the Newbern inquired of the mate if the master of the Costa Rica desired to be towed into port, to which the mate replied that he did not know; that his orders were to go to San Diego. He also declined to advise the master of the Newbern to go to the assistance of the Costa Rica; telling him that the master of the latter vessel intended to work his ship into Cape Colnette. The master of the Newbern determined to turn around, and see if the Costa Rica required assistance. This he did at about half past 12 o'clock, and reached the Costa Rica about half past 4 the same afternoon. The distance run back was about 25 miles. The Newbern took the disabled steamer in tow, and at about 9 o'clock on the evening of the succeeding day arrived with her tow off the mouth of the harbor of San Diego. As no pilot presented himself, the vessels remained outside until about half past 7 of the succeeding day, when they entered the port, and at about 9 o'clock the Costa Rica was anchored alongside the wharf. The Newbern proceeded on its way to San Francisco. The distance run by the Newbern after turning back was about 25 miles. The distance towed was about 110 miles. The hawsers used in towing belonged to the Costa Rica. The time consumed in the service was about 40½ hours, but to this must be added the time employed in running back 25 miles,—about 4 hours,—making a total service of 44½ hours. The Newbern, while towing the Costa Rica, was still proceeding towards her port of destination, though not by the most direct route, nor at her usual rate of speed. The service was attended by no particular difficulty or danger. The weather was fair, and the sea smooth. At the time the Newbern took hold of the Costa Rica the latter was in no immediate danger. With favorable winds she could probably have reached safe anchorage at Cape Colnette in 18 or 20 hours, and San Diego in 4 or 5 days, but other assistance was near at hand. The mate of the Costa Rica

was about to enter the harbor of San Diego to secure assistance from the company to which the steamer belonged, when the master of the Newbern learned of the accident to the Costa Rica, and proceeded to her assistance. In fact, a vessel was dispatched to her assistance which arrived at San Diego on the morning after the two vessels reached that port. The value of the Costa Rica, with her cargo and freight to be earned, was $244,756.64. The value of the Newbern, with her cargo, was $242,010. For the service of the Newbern Judge Hoffman awarded the sum of $10,000. The value of the Costa Rica and her cargo was greater than that of the Sirius, and the value of the Newbern was greater than that of the Tillamook, but in every other respect the circumstances attending the service of the Tillamook were such as to call for at least double the compensation awarded to the Newbern. The service of the Tillamook commenced on the morning of February 25th, when she steamed down to South bay, and terminated on the morning of March 1st, at San Diego, having consumed five days. Captain Gregory testifies that the total distance of the towage from South bay to San Diego was 320 miles. The Costa Rica was towed 110 miles. The Tillamook was actually engaged 98 hours in towing the Sirius; the Newbern 40½ hours in towing the Costa Rica. The hawsers used in towing the Costa Rica belonged to that vessel; the hawser used in towing the Sirius belonged to the Tillamook. The Sirius was in a more dangerous position than the Costa Rica, and the service rendered by the Tillamook possessed more of the elements of salvage than appear in the service rendered by the Newbern.

In the case of The Wellington, 48 Fed. Rep. 475, the value of the salved property is not stated in the opinion of the court, but from the record in the case it appears that the vessel was of the value of about $100,000, and the cargo, including freight to be earned, about $25,000, —total, $125,000. The distance towed was about 544 miles, and the time consumed in towing a little less than four days. There was an agreement to pay for the towage service the sum of $15,000, and this agreement was enforced by the court.

In the case of The Wellington, 52 Fed. Rep. 605, the same vessel again became the subject of a salvage service. The value of the vessel was $100,000. The distance towed was about 150 miles. The time consumed was 26 hours. The owners of the Wellington voluntarily paid to the owners of the vessel rendering the service the sum of $10,000, and this court awarded an additional compensation to the master of $2,500, and to the crew $100 each. These comparisons, and others that might be made, indicate that the charge made by the Tillamook, and incorporated into the contract, was high, approaching the degree of being deemed unreasonable; but I cannot say, under all the circumstances, that it is so unreasonable as to be wholly inequitable and unjust. If the amount agreed upon exceeds somewhat the accustomed measure of a liberal award, it will not be disturbed, if deliberately and understandingly assented to, without the judgment of the promising party being overborne by the distress in which he is placed. The Adirondack, 2 Fed. Rep. 387. I am therefore of the

opinion that the contract should be enforced by the court, and a decree will accordingly be entered in favor of the libelants for the sum of $20,000.

## APPORTIONMENT OF SALVAGE AWARD.

(January 12, 1893.)

MORROW, District Judge. The libelant and interveners in this case have asked the court to make distribution among the salvors of the amount of the award under the contract, in conformity with the admiralty practice in this class of cases. The decree will accordingly provide for such distribution. In the performance of the service provided in the contract the steamer Tillamook was the principal factor, and she, of course, assumed the risk of failure and disaster. I will therefore award to her charterers the sum of $13,250.

I think the conduct and service of the master of the Tillamook entitle him to some special consideration. He promptly procured additional stores for the Sirius, and offered to take an officer of that vessel to Ensenada or San Diego for assistance without charge and without delay. He also engaged in the towage service against the protest of two of the passengers on his own vessel. It is the policy of the law to encourage the rendering of prompt and efficient assistance to vessel in distress, as was done by Capt. Hamm in this case. I will therefore award to him the sum of $2,500. In distributing the remainder of $4,250 among the other officers and crew of the vessel, consideration will be given to the relation of the services performed, to the extra work required in towing the other vessel, and the amount of wages paid to each. The decree will accordingly provide as follows:

| | | |
|---|---|---:|
| To the first engineer | | $  700 00 |
| " " | second engineer | 500 00 |
| " " | two firemen, $400 each | 800 00 |
| " " | first mate | 400 00 |
| " " | second mate | 300 00 |
| " " | cook | 200 00 |
| " " | cabin boy | 100 00 |
| " " | five seamen, $250 each | 1,250 00 |
| | | $4,250 00 |

### RECAPITULATION.

| | |
|---|---:|
| To the charterers of the Tillamook | $13,250 00 |
| To the master | 2,500 00 |
| To the other officers and crew | 4,250 00 |
| | $20,000 00 |