Mr. Justice GREER
 

 delivered the opinion of the eourt.
 

 . The libellants, owners of the ship Richmond and cargo, filed the libel in this cáse for an adjustment of salvage.
 

 .. They allege, that -the ship Richmond left the port of Cold Spring, Long Island, on a whaling voyage to the North and South Pacific Ocean,- in July, 1846; that on the 2d. of August, 1849, in successful prosecution of her .voyage, and having nearly a foil cargo, she was run upon some rocks on the coast of Behring’s Straits, about a half mile from shore; that while so disabled, the whaling ships Elizabeth Erith and the Panama, being in. the same neighborhood, and about to return home, but not having full cargoes, each took on'board some seven or eight hundred barrels of oil and a large quantity of whalebone from the Richmond’; that these vessels have arrived in the port of Sag Harbor, and their owners are proceeding to sell said oil, &e., without adjusting or demanding salvage, unjustly setting up a pretended sale of the Richmond and her cargo to them by her master. '
 

 . The libellants pray to have possession .delivered to them of the oil, ~&c., or its proceeds, if sold, subject to
 
 “salvage and frek/ht”.
 

 The claimants, who are owners of the ships Frith and Panama, allege, in their answer, that the Richmond was wholly and irrevocably wrecked; that her officers and crew had abandoned her, and gone on abarren and uninhabited shore nearby; that
 
 *157
 
 there were ho inhabitants or persons on that part of the globe, from, whom any relief eould.be obtained, or who would accept , her cargo, or take charge, thereof, for a salvage compensation; that the cargo of the Richmond, though valuable in a good market, was of. little or no value where she lay; 'that the season during- which it was practicable to remain was nigh its close; that the entire destruction of both vessel and cargo was inevitable, and the loss of the lives of the crew almost certain; that, under these circumstances, the master of the Richmond concluded to sell the vessel at auction, and so much of her cargo as was desired by the persons present, which was done on the following day, with the assent of the whole ship’s company.
 

 ■ Respondents aver that this sale was a fair, honest, and valid sale of the property, made from necessity, in good faith, and for the best interests of all concerned, and that they are 'the rightful and bona fide owners of the portions of the cargo respectively purchased by them.
 

 The District Court decreed in favor of claimants; on appeal to the Circuit Court, this decree was reversed; the sale was pronounced void, and the respondents treated as salvors only, and permitted to retain a moiety of the proceeds of the property as salv'age.
 

 ■ The claimants have appealed to this court, and the questions proposed for. our consideration are, 1st, whether, under the peculiar circumstances of this case, the sale should be treated as conferring a valid title; and, if not, 2d, whether the salvage allowed was sufficient.
 

 1. In the examination of the first question, we shall not inquire whether there is any truth in the'allegation that the master of-the Richmond was in such a state óf bodily and mental infirmity as to render him incapable of acting; or .whether he was governed wholly by the undue influence and suggestions of his brother, the master of the Frith.- For the decision of this point, it will not be found necessary to impute to .him either weakness of intellect or want of good faith. ;
 

 It cannot be doubted that a master has power to sell both' ■’vessel and cargo in certain cases of absolute necessity.. This, though nowthe. received doctrine of the módern English and American cases, bias not been universally received as a principle of maritime law. The Consfilado del Mare (art. 253) allows the master a power to sell, when a vessel becomes unseaworthy from ago; while the laws of Oleron and ’Wisby, and the ancient French ordinances, deny such, power to the master in any case. The reason' given by Valin is, that such a permission, under any circumstances, would’ tend to encourage fraud. But, while .the power is not denied, its exercise should be closely seruti-
 
 *158
 
 nized by. tbe court, lest it be abused. "Without pretending to enumerate or classify-the multitude of cases on this subject, or to state all the possible conditions under which this necessity may exist, we may say that it is applied to cases where the vessel is disabled, stranded, or sunk; where the master has no means. and can raise no funds to repair her so as to prosecute his voyage; yet, where the
 
 spes recuperandi
 
 may have a value in the market, or the boats, the anchor, or the rigging, are or may be saved, and have a value in market; where the cargo, though damaged, has a value, because it has a market, and it may be for the interest of all concerned that it be sold. All the cases assume the fact of a sale, in a civilized country, where inen have money, where there is a market and competition. They have no application to wreck in a distant ocean, where the property is derelict, or about to beeome so, and the person who has it in his power to save the crew and salve the cargo prefers to drive a bargain with the master. The necessity in . such a case may be imperative, because it is the price of safety, hut it is not of that character which permits the master to exercise this power.
 

 , As many of the circumstances attending this case are peculiar and novel, it may not be improper to give a brief statement of them. The Richmond, after a ramble of three years on the . Pacific, in pursuit of whales, had passed through the sea of Anadin, and was near Behring’s Straits, in the Arctic ocean, on the -2d of August, 1849. She had nearly completed her cargo, and was about to return; but, during a thick fog, she was run upon rocks, within half a mile of the • shore, and in a situation from which it was impossible to extricate- her. The master and crew escaped in their boats to-the shore, holding communication with the vessel, without much difficulty or danger. They could probably have transported the cargo to the ijeach, but this would have been unprofitable labor, as its condition would not have been, improved. Though saved • from the ocean, it would hot have been safe. The coast was barren; the few inhabitants, savages and thieves. This ocean is navigable for only about two months in the year; during .the remainder of the year it is sealed up with ice. The winter was expected to commence within fifteen or twenty days, at farthest. The nearest port of safety and general commercial intercourse was at the Sandwich Islands, five thousand miles distant. Their only hope of escape from this inhospitable region was by means of other whaling vessels, which were known to be cruising at no great distance', and who had been in company with the Richmond, and had pursued the same course.
 

 On the 5th of August the fog cleared off, and the ship Eliza-
 
 *159
 
 betb Frith was seen at a short distance. The officers, of the Richmond immediately went on board, and the master informed the master of the Frith of the disaster which had befallen the Richmond. He requested him to take his crew o'n board, and said,' “You need not whale any more; there is plenty of oil there, which you may take, and get away as soon as possible.’’ On the following day they took on board the Frith about 300-barrels oil from the Richmond. On the 6th, the Panama and the Junior came near; they had not quite completed their cargoes; as there was more oil in the • Richmond than they could all take, it was proposed that they also should complete their cargoes in the same way. Captain-. Tinkham, of the Junior, proposed to take .part of the crew of the Richmond, and said he would take part of the oil, “provided it was put up and sold at auction.” In pursuance, of this suggestion, advertisements were posted on each of the three vessels, signed-fry or
 
 for
 
 the master of the Richmond. On the following day the forms of an auction sale were eáacted; the master of the Frith bidding one dollar per barrel for as much as he needed, and the others seventy-five cents. The qhip and tackle were sold for five dollars; no money was paid, and no account kept or bill of sale made out. Each vessel took enough to complete her cargo o£ oil and boné. The transfer was effected in a couple of days, with some trouble and labor, but little • or no risk or danger, and the vessels immediately proceeded on their •voyage, stopping as usual at the Sandwich Islands.
 

 Now, it is evident, from this statement of the facts, that, 'although the Richmond was stranded near the shore upon which her crew and even her cargo might have been saved, from the dangers of the sea, they were really in no better situation as to ultimate safety than if foundered or disabled in the midst of the Pacific ocean. The crew were glad to escape with- their liyes. The ship and cargo, 'though not actually derelict, must necessarily have been abandoned. The contrivance of an auction sale, under such circumstances, where the master of the Richmond was hopeless, helpless, and passive — where there was no market, no money, no competition-r-where one party had- absolute power, and the other no choice but submission— where the vendor must take what is offered or get nothing — is a transaction which has no characteristic of a valid contract. It has been contended by the claimants that it would be a ; great-hardship to treat this salé as a nullity, and- thus compel them tb assume the character of salvors, because .they were hot -bound to save this property, especially at so great a dis-' tanee from any port of safety, and in a place where they could have completed their, cargo in a short time from their own
 
 *160
 
 eatchings, and where salvage would be no compensation for the loss of this, opportunity. The force- of these arguments is fully appreciated, but we think they are not fully sustained by the facts of the case.' "Whales may have been plenty around their vessels on the 6th and 7th of August, but, judging' of the future from- the past, the anticipation of filling up their cargo in the few days of the season in which it would be safe to remain, was very uncertain, and barely probable. The whales-were retreating towards the north pole, where they could not be pursued, .and, though seen in numbers on one day, they would disappear on the next; and, even when seen in greatest numbers, their capture wás uncertain. By this'transaction, the vessels were enabled to proceed'at once on their home voyage-; and the certainty of a liberal salvage allowance for the property rescued will be ample compensation for the possible chance of greater profits, by refusing their assistance in saying their neighbor’s property..
 

 It has been contended, also, that the sale was justifiable and valid, because it was better for the interests of all concerned to accept what was offered, thán suffer a total loss. ,But this argument proves too much, as it would justify eveiy sale to a salvor. Courts of admiralty will enforce contracts made for salvage service and salvage compensation, where the salvor has not taken advantage of his power to make an unreasonable bargain; ' but they will not tolerate the doctrine that a salvor can take the advantage of his situation, and .avail himself of the calamities of others to drive a bargain; nor will they jpermit the,performance of a public, duty to' be turned into a traffic of profit. (See 1 Sumner, 210.) The general interests of commerce will'be much better promoted by requiring the salvor to trust' for. compensation to the liberal recompense . usually awarded by courts for such services. We are of opinion; therefore, that the claimants have hot obtained a valid title to the property in dispute, but must be treated as salvors.'
 

 . 2. As to the amount of salvage.
 

 While we assent to the general rule stated by this court; in Hobart
 
 v.
 
 Dorgan, (10 Peters, 119,) that “it is against policy and public convenience to encourage appeals of this sort in matters of discretion,” yet it is equally true, that where the law gives a party an appeal, he has a right to demand the conscientious judgment of the appellate court on every question arising in the cause. Hence many cases are to be found where the appellate court have either increased or diminished the allowance of'salvage originally made, even where it did not . “violate any of the just principles which should regulate the subject.” (See The Thetis, 2 Knapp, 410.)
 

 
 *161
 
 Where it is not fixed, by statute, the amount of salvage must necessarily rest on an enlarged discretion, according to the circumstances of each case. .
 

 The case before us is properly one of derelict. In sueh cases,, it has frequently been asserted., as a general rule, that (he compensation should not be moré than half nor less than a third of the property saved. But we agree with Dr. Lushington, (The Florence, 20 E. L. and C. R., 622,) “that the reward in. derelict cases should be governed by the same principles as other salvage cases — namely, danger to properly, value, risk of life, skill, labor, and the duration of-the service;” and that “no valid reason can be assigned for fixing a reward for salving derelict property at a moiety or any given proportion; and that the true principle is, adequate reward, according to the circumstances of the case.” (See, also, The Thetis, cited above.) ..
 

 The peculiar circumstances of this case, which distinguish it from all others, and which would justify the most liberal allowance for salvage, is the distance from the home port, twenty-seven thousand miles; and from the Sandwich Islands, the nearest port of safety, five thousand miles. ,The transfer of the property from the wreck required no extraordinary exertions or hazards, nor any-great delay. The greatest-loss'incurred was the possible chance, that before the season closed -in, the salving vessels might have taken a full‘cargo of their own oil. But wé think this uncertain and doubtral specula^ tion will be fairly compensated by the certainty of a moiety ■. of the salved property at the first port of safety.. The libel-lants claim only the balance, “after deducting salvage <nd
 
 freight”
 
 conceding that, under the circumstances, the salvors were entitled to both. When the property was brought to a port of safety, the salvage service was complete, and the salvors should be allowed freight for carrying the owners’ moiety over twenty thousand miles, to a better market, at the home port. As this case has presented very unusual circumstances, and as we think the claimants have acted in good faith in making their defence, all the taxed costs should be paid out of the fund in court.
 

 The case is therefore remitted to the Circuit Court, to have the amount due to each party'adjusted, according to the principles stated.
 

 Order.
 

 This cause came on to be heard on the transcript of the record from the Circuit Court of the .United States for the southern district of New York, and was argued by counsel,
 
 *162
 
 ai. On consideratioü whèreof~ it is now here ordered and decreed by this court, that the decree of the said Circuit Court in this cause be and the same is hereby reversed, and that this cause be and the same is hereby remanded to the said Circuit Court, with directions to have the amount due to each part~y adjusted, according to the principles stated in the opinion of this court, and that all the costs of said cau~e in this court, a.nd in the Circuit and District Courts, be paid out of the fund in the said Circuit