## The Neto and Cargo.

(*District Court, S. D. Florida.* March 2, 1883.)

1. SALVAGE—AMOUNT AWARDED.

Measure of reward in cases of salvage where the peril to the salved vessel was great depends upon the circumstances of the case and the award is in the sound discretion of the court; it is not to be measured positively by the value of the property in peril, yet this may always be taken into account in determining the amount, as the owners are benefited in that proportion, and a small percentage assists in compensating salvors for services that are frequently performed where the property is so small that adequate remuneration cannot be given without a hardship to the owner.

2. SAME—PRECEDENTS.

Although each cause is disposed of upon its own merits, the discretion of the court should be guided by general principles, and in applying them should, as far as practicable, where circumstances show a similarity of reasoning and common point of agreement as to amount, consider the precedents of adjudicated cases.

Amounts awarded in cited cases.

In Admiralty.

*Jeff. B. Browne,* for libelants.

*G. Bowne Patterson,* for respondents.

LOCKE, J. This steam-ship laden with a valuable cargo of cotton, bound from Galveston to Liverpool, went ashore on Pulaski reef, a small rocky shoal, the most north-easterly of the Tortugas group, the evening of January 30th, and when boarded by the libelants, with two vessels and eighteen men, the next morning, was lying hard ashore on a rough and rocky bottom with the wind and sea pressing her further aground, with 16½ feet of water under her bows, 17 under her stern, and from 12 to 14 feet amidship. A ridge of rock with from 12 to 14 feet, extended across at a short distance from her stern, and there was a shoal with 15 feet off her starboard quarter, and another, with about the same depth, a little forward, off the starboard bow. She was drawing before going ashore 18 feet 3 inches. She had struck the reef at about right angles swinging around, and must have surged backward and shoreward until she was in a very dangerous position. The weather was bad, with a strong breeze and high sea, and the libelants were unable to do anything the first day to assist her. She thumped somewhat heavily, and at times the sea broke over her. The next day, the wind and sea having somewhat abated, the libelants carried out a heavy anchor with chain, and an 11-inch hawser into deep water, took one load, 80 bales of cotton, about five miles to

Garden Key, then loaded both their vessels, discharging in all about 200 bales; but finding it necessary to lighten her still more, the master having consulted with libelants, they jettisoned between five and six hundred bales. By heaving constant strains on the windlass, about 3 o'clock the afternoon of the third day, at high tide, the steamer came off.

The position of the vessel, the nature of the bottom where she lay, the force of the wind and sea while she was aground, show her condition to have been one of considerable danger. Every moment she was resting on the bottom was one of unquestioned peril. The master was unable to do anything to relieve her from the bottom. He candidly admits that with the wind and sea as they were he could not carry an anchor with his boats, and every ton jettisoned until that had been done would have but served to drive the vessel further up into shoal water, while the shoals on the bow, quarter, and astern rendered it impossible to use her propeller with advantage. She was out of the way of passing steamers, with no assistance nearer than Key West, about 65 miles, and no means of communication.

The wind and sea increased the night and next day after she came off, and I can but believe that had the salvors not rendered the aid at the time they did, she would, by another tide, have been so bilged and broken as to have necessitated an entire discharge of cargo and probably a total loss of the vessel. They rendered the property an especially needed and valuable service. There are though some circumstances connected with it which must prevent the highest rate of salvage compensation, not from any fault of the salvors, but on account of their inability to save to the owners in an undamaged condition the entire property found in peril by them.

The fact that to save the ship it was necessary to jettison five hundred bales of cotton, although detracting nothing from the credit of the libelants for what they did, yet must reduce their compensation from what it might otherwise have been. Had there been a sufficient number of vessels present to save to the owners the amounts which must now be lost in the damage to jettisoned cotton, and salvage on it, providing it is all saved, an extraordinarily large salvage could have been more easily paid than can a comparatively small one under the present circumstances. I do not intend to imply that what was done was not for the best, and that the cotton should not have been jettisoned; on the contrary, I am satisfied that it was only by said jettison the rest was saved, but it was the insufficient number of the salvors which necessitated it. Although the presence and aid of

the salvors I consider to have been indispensable to the rescue of the property, and that they enabled the appliances of the steamer to be used with great advantage, yet the greater part of the actual labor performed was by means of the steam-power.

Under the circumstances what may be considered just and fair salvage or amount to be awarded? It is unnecessary to review the principles of salvage and the grounds, reasons, or theory of its allowance or amount, as they have been so often stated and enlarged upon. Although all courts cite the same rules and decide upon the same principles, there is probably no class of causes in which precedents are examined and compared with less satisfaction, than in those of salvage.

The learned judge in *The Waterloo*, Blatchf. & H. 124, remarks:

"The want of fixed principles of compensation is the source of serious perplexity to courts and of uncertainty to parties in interest. * * * Probably, nowhere can judicial discretion be less intelligently and satisfactorily exercised than in matters of salvage."

Although each cause is disposed of upon its own particular merits, and is referred to the discretion of the court which acts in the matter, this discretion should, as far as possible, be guided and controlled by certain general considerations which have been found to enter into the estimates made by courts; and whenever several causes are found so nearly parallel in their circumstances as to offer a line of precedents, or different circumstances can be so explained as to show a similarity of reasoning and a common point of agreement as to amount, such should be considered in reaching a conclusion, although not, perhaps, necessarily accepted as binding.

Salvage services rendered in different localities are apt to be diverse in their nature—the character of the salvors engaged, the needs of the property assisted, or the probabilities of loss or the arrival of other help; and where causes can be selected from the same district it may not be amiss to accept suggestions and examples which may be drawn from them.

In this, as in all such cases, there seems to be a wide difference of opinion as to the value of the services rendered, or rather the amount that should be given for them; and it may be permissible in this connection to examine a few cases found in the records of this court, which, if not parallel in all respects, yet are sufficiently similar to assist somewhat in determining the question presented here.

In December, 1848, the steamer Anglo-Saxon was found badly ashore in an exposed condition near Cape Florida. The salvors with

three vessels and forty-three men went to her assistance and by carrying out anchors, lightening her of cargo, and throwing overboard coal and wood, after three days hard labor got her afloat. Judge MARVIN considered that she was in great danger and the service especially valuable, and gave a salvage of 40 per cent. upon $30,000.

In April, 1867, the British steamer Gladiator went ashore on Florida reef within sight of Key West. Eight vessels with sixty-six men went to her assistance. The master declined aid until he had thrown overboard about 160 tons of coal and iron, when finding she did not float he accepted the services of the salvors; they carried out an anchor, and took out two loads of cargo when she came off without damage. There were no particular circumstances of peril. Judge BOYNTON awarded the salvors 9 per cent. on an estimated value of $160,000.

The same month the steamer William Taber was run ashore full of water also within sight of Key West; 10 vessels with 103 men relieved her of a portion of her cargo, pumped her out with a steam-pump, and brought her to Key West. There were no circumstances of peculiar peril affecting the award of salvage, although there was a question as to the cause of the disaster, and 10 per cent. on a valuation of $169,730 was given.

In October of the same year the George Cromwell, having broken her shaft and split her stern post so that she was leaking badly, was run aground on a portion of the reef about 25 miles from Key West; 19 wrecking vessels, with 136 men, and a small steamer with a steam-pump went to her aid, took out the greater portion of her cargo, pumped her free, and brought her to port. In that case 25 per cent. on an appraisement of $87,214 was awarded.

In December, the same year, the Perit ran ashore on Molasses Reef, about 100 miles from Key West. The master threw overboard about 50 tons of coal, carried out a kedge and succeeded in backing her about her length, but not getting afloat, accepted the assistance of nine vessels with forty-nine men; they took out two loads of cargo, carried out a large anchor, and heaved her off. The weather was fine and she lay on a smooth and even, though hard, rocky bottom. Eight per cent. was given on a value of $115,000.

In January, 1868, the steamer Mary went ashore in about the same locality. The master carried out an anchor and succeeded in getting his vessel afloat, but in backing astern again got aground, and finding himself unable to relieve her the second time, accepted the assistance of seven vessels, carrying fifty-four men, who, by carrying out a

heavier anchor and lightening the vessel by taking out cargo and coal, some of which was thrown overboard, succeeded in getting her off in an undamaged condition. In this case the weather was bad, and the vessel rested directly upon a large boulder nearly amidship, which rendered her position one of peculiar peril. The court awarded 18 per cent. on a valuation of $31,480.

In the same year the steamer Rochester got ashore on a shoal near Cape Florida where the bottom was quicksand. The master carried out his anchor but in so doing sunk his boat; he endeavored to heave the steamer off but failed, and the weather being bad and threatening he accepted the assistance of two vessels and thirteen men that went out to him. The wind was high and the salvors had much difficulty in getting her afloat on account of the anchors coming home when a strain was put upon them, but the vessel being on soft sandy bottom was in no great or unusual peril. One-eighth of the valuation of $9,000 was given as salvage.

The steamer General Meade went ashore on Maryland Shoal about twenty miles from Key West. Six vessels carrying sixty-three men went to her assistance and by loading two schooners with cargo and carrying out a heavy anchor heaved her afloat. There was considerable wind and sea and while coming off she knocked her rudder out of place, and the salvors were compelled to employ one of the schooners to steer her while coming to port. Salvage of $16,000 was awarded on a value of $166,000.

In September, 1870, the steamer Juniata was driven ashore by a hurricane above Cape Florida. She was hard and fast aground on a bank of quicksand. Ten vessels carrying 56 men went to her relief, took out a considerable portion of her cargo, and got her off by an anchor and her propeller. She was in comparative safety for the time being, so hard ashore on a smooth bottom that she could neither roll or thump, but she was utterly helpless, and there was a great deal of labor and considerable skill required to get her off. Judge McKinney allowed a salvage of $17,500 on a value of $149,875.

In February, 1873, the Wilmington struck on a portion of the Florida reef, about 95 miles from Key West. The master commenced throwing overboard cargo, but finally accepted the aid of the salvors who, by carrying out an anchor and lightening the vessel still more by taking cargo on board their vessels, succeeded in getting her off. Her situation on the reef was, in some respects, similar to that of the case at bar, as the wind was pressing her further aground, and there was a shoal on the quarter which rendered it impossible to back

her off, even by lightening, without the assistance of an anchor. After relieving her the salvors saved from the water about $16,000 worth of cargo, which the master had jettisoned before accepting their aid and after their leaving, about $950 worth more was dived up from the bottom. Salvage, 10 per cent on $75,000 estimated value of vessel and cargo on board, 30 per cent. on that saved afloat as jettisoned, and 50 per cent. upon that subsequently dived up, or that which went adrift and was afterwards found derelict, was given.

In September, 1875, the City of Waco was ashore on the Florida reef on a rough rocky bottom resting partially on a boulder or rocky head which made her position particularly dangerous. Ten wrecking vessels with about sixty men went to her assistance, and by carrying out an anchor and lightening her of considerable cargo heaved her off in an uninjured condition. The steamer and cargo were considered to be worth about $250,000 and a salvage of $16,000 was awarded.

In October, 1876, the City of Houston was driven by a hurricane over the Florida reef and over a second or inside rocky ridge upon which, with ordinary high tides there was but seven and a half feet of water, into five feet, she drawing before going ashore fourteen feet. The bottom where she lay was soft and she for the time in no danger of further damage, but she was so far lost to her owners as to require immediate and active exertions to float her, as it was within a few days of the highest tides of the season, and the draught of the steamer, light, was eight feet. Twenty-four vessels, one of which was a steamer, and nearly three hundred men were engaged in the service for about a week. They took out all of the coal and nearly all of the cargo, leaving barely enough to shift from one end of the vessel to the other, by which means and the assistance of a steamer they succeeded in working her over the shoal and brought her to Key West. Although the property was in no danger of immediate destruction or further loss, the court considered it a salvage service *eo nomine* and not a simple compensation *pro opere et labore*, and gave $17,-500 on a valuation of about $400,000.

In December, 1881, the British steam-ship Hector, laden with cotton valued at about $300,000, went ashore on the quicksands but a few miles from where this vessel lay. She was hard and fast ashore with the sand piled badly around her, and in considerable danger. The weather was bad, and she was in an exposed condition. Nineteen wrecking vessels, one being a steamer, several of the smaller class, with nearly 200 men, were engaged in the service. They dis-

charged 381 bales of cotton, carried out a 5,000-pound anchor and got her off ready to proceed on her voyage with no damage to vessel or cargo. The court awarded a salvage of $20,000.

In April, 1882, the Spanish steamer, the Buenaventura, west ashore also on the quicksands, but further in among the shoals, diminishing her immediate danger from the sea, but rendering a pilotage service more necessary. A United States quartermaster schooner fell in with her, and the master and crew rendered her most valuable assistance by carrying out an anchor, taking on board 175 bales cotton, and, when she came off, piloting her some five miles through intricate and dangerous channels into deep water. In this case, as in the one at bar, the schooner was unable to receive as much cotton as was necessary to lighten the steamer, and about 150 bales were jettisoned. There were a small number engaged in the service, and the actual labor performed was slight, with no risk to the property of the salvors, it being a government vessel, but it was of great value to the property in jeopardy, and required a peculiar knowledge of the locality, channels, and shoals. The property was estimated to be worth about $200,000; the court awarded $3,000, $400 of which was to repair damage done to the schooner while coming alongside to take the anchor, the rest to be divided among her officers and crew.

Among these cases no one is similar in all respects to the one at bar, yet they have certain points of resemblance which may assist in considering this question of amount. They were all steam-ships stranded upon the Florida reef, and all assisted by licensed professional wreckers; all were aided by carrying out anchors and lightening of more or less of their cargoes. In all cases a large proportion of the actual labor performed, has been by the steam-power of the vessel assisted. It is true these cases are taken from the records of one court, but I find that the amounts awarded compared favorably with those given by other courts under like circumstances. It is true that salvage is not to be measured positively by the value of the property in peril, yet this may always be taken into account where determing an amount, as the owners are benefited in that proportion, and a small percentage assists in compensating salvors for services that are frequently performed where the property is so small that adequate remuneration cannot be given without a hardship to the owner.

A larger amount may therefore be allowed where the value of the property is large. In this case the amount involved will permit a lib-

eral compensation without being burdensome to the property, and I consider that $9,625 will in view of all the circumstances be a fair and just, but liberal award, and the decree will follow for such amount with costs.

---

## THE DREW.

*(District Court, S. D. New York.   March 20, 1883.)*

1. COMMON CARRIER—DELIVERY—NEGLIGENCE.
    Common carriers are bound to make delivery of goods according to their address.   They are answerable for frauds upon themselves, but not for frauds upon the shipper, of which they are not chargeable with notice.

2. SAME—TWO PERSONS OF SAME NAME.
    Where goods were shipped by the steamer D., addressed to "J. K., Albany," without any street address, and there were two persons in Albany of that name, one an old tradesman of good repute, who, on tender of the goods, refused them as not intended for him, and the goods were afterwards delivered from the steamer to the other person of that name, who had had a store there for a few weeks previous, where he had received goods purchased, and he was, in fact, the same man who purchased the goods of the shipper in New York, but who, shortly after the delivery, abandoned his store and disappeared, *held,* though presumptively a swindler, and though the shipper supposed the purchaser was the other tradesman of the same name, yet that the steamer was not chargeable with any knowledge of these facts, and was not liable as upon a delivery of the goods to the wrong person, but, upon refusal by the other "J. K.," was warranted in delivering them upon the claim of the former.

In Admiralty.

*Kurzman & Yeaman,* for libelants.

*W. P. Prentice,* for claimant.