**PLATORO LIMITED, INC., an Indiana corporation, as Salvor,**

v.

**The UNIDENTIFIED REMAINS OF A VESSEL, her cargo, apparel, tackle and furniture, in a cause of salvage, Civil and Maritime.**

**Civ. A. No. 69–B–86.**

United States District Court,
S. D. Texas,
Brownsville Division.

Dec. 26, 1973.

Hardy, Sharpe & Rodriguez, Thomas G. Sharpe, Jr., Brownsville, Tex., for plaintiff.

John L. Hill, Atty. Gen., of Texas, Larry F. York, First Asst. Atty. Gen., and Elizabeth B. Levatino, Sp. Asst. Atty. Gen., Austin, Tex., for the State of Texas.

McCullough, Murray & McCullough, and Gordon L. Briscoe, Harlingen, Tex.,

for intervenors Jefferson T. Burke and Billy Russell Algoe.

Frances Tarlton Farenthold and Roger Butler, Corpus Christi, Tex., for Robert D. Bluntzer, Sr. and Henry H. Hildebrand, Realtors in Cause No. 81, in the District Court of Kennedy County, Texas, who have filed an amicus curiae brief with leave of Court.

GARZA, District Judge.

Platoro Limited, Inc., an Indiana corporation, brought this suit in a cause of salvage, civil and maritime, against the unidentified remains of a vessel, her cargo, apparel, tackle and furniture on August 6, 1969. The plaintiff-salvors had located the remains of Spanish vessels, which sank during a hurricane in the year 1554, off the shores of historic Padre Island, located in the Gulf of Mexico. The recovery of the artifacts made the subject of this lawsuit were recovered by the plaintiff in September, October, November and December of 1967, until restrained on December 13, 1967, by a temporary restraining order out of the 28th Judicial District Court of Kennedy County, Texas. Because of the pendency of the state suit, notice was given to the State of Texas, although the plaintiffs in this case proceeded in their salvage claim by the issuance of a monition.

The State of Texas appeared and filed its plea of immunity from suit and asked that the same be dismissed for want of jurisdiction. After holding a hearing on January 17, 1970, this Court issued a Memorandum dated the 12th of June, 1970, 371 F.Supp. 351, in which it held that this, in truth and in fact, was a true salvage claim, retained jurisdiction, and left the question of a salvage award for a later hearing. This Court's Memorandum of June 12, 1970, is hereby adopted by reference and must be read in connection with this Memorandum to fully understand what this Court is holding, and any findings of facts or conclusions of law reached in said Memorandum of June 12, 1970, are hereby adopted by reference.

At the time of its Memorandum and Order of June 12, 1970, this Court certified its interlocutory decree, under 28 U.S.C. § 1292(b), allowing the State of Texas to seek an immediate appeal of the Order, but the Honorable Circuit Court of Appeals for the Fifth Circuit, on August 11, 1970, denied the interlocutory appeal on the order of Judges Ainsworth, Bell and Godbold. In the meantime and subsequent to the denial of the interlocutory appeal, two intervenors sought leave of the Court to intervene. They were Jefferson T. Burke and Billy Russell Algoe. They were also making salvage claims on the items recovered from the sunken Spanish galleon.

The Court was interested in finding out what the value of the artifacts salvaged was, so as to be in a position to make the salvage award. A haphazard attempt was made to comply with the Court's wishes to get experts to put a value on the artifacts that were recovered, but it was not until a hearing held in this Court on November 1, 1973, that the Court was able to get sufficient evidence into the record of the value of the goods salvaged.

There is no question that the artifacts recovered are of great historical value, but unfortunately we cannot put a dollar sign on an historic work and we are relegated to the recognized rule of commercial or market value.

The State of Texas is still stressing and urging vehemently its position that this Court is without jurisdiction in this matter. They say that the *res* made the subject of this salvage claim was not physically within the boundaries of the jurisdiction of this Court at the time the salvage claim was filed; that the artifacts were in Austin, Texas, which is in the Western District of Texas, and outside the jurisdiction of this Court. They also urge that this Court has never arrested the *res* and has no control over it. They say that this Court's posses-

sion of the *res* is constructive, at best, and constructive possession is not enough to confer jurisdiction on this Court. They cite to this Court the case of The Zev, 63 U.S.App.D.C. 146, 70 F. 2d 750 (1934), in which an *in rem* action was dismissed for lack of jurisdiction. This Court does not disagree with that case, but the facts in this case are distinquishable from the case of *The Zev*. There is no question that the salvage operations made the basis of this lawsuit took place within the jurisdiction of this Court. The artifacts recovered were entered through Customs within this District, and then removed to Indiana, by the salvors who were of the mistaken belief that they were sole owners under some theory of "finders-keepers".

■ When the state suit above referred to was filed and the plaintiffs enjoined from further salvage operations, the then Land Commissioner of Texas, Jerry Sadler, began extensive negotiations with the plaintiffs herein with regard to a division of the salvaged items and the future exploration of the sunken vessels, which resulted in a contract being drawn dividing the salvaged articles then existing on a fifty-fifty basis. This contract was signed by the plaintiff, but apparently never executed by the Commissioner. Acting on the assumption that they had a contract, the salvors in this case returned most of the artifacts to the Land Commissioner's office in Austin, and those that were not returned at that time were returned later under orders of the State District Court in the suit above referred to. Once the artifacts found by the salvors were in the custody of the Land Commissioner, he disowned the contract that he had been discussing with the plaintiffs, and stated that he had only done what he had done to get the artifacts back to the State of Texas. I find that if the *res* in this case is in the Western District of Texas, it is there by the fraud committed by the then Land Commissioner of Texas, or under the orders

of a State Judge, and it cannot be urged by the State now that the jurisdiction lies in the Western District of Texas because of the fraudulent actions of its then Land Commissioner.

At the time the suit was filed in the State Court of Kennedy County, the State Judge, on his own motion, had taken *custodia legis* of the *res* in this lawsuit and at first ordered the *res* held in the Land Commissioner's office and later transferred it by order to the Texas Archeological Research Laboratory in Austin, Texas, for restoration and to be fully and completely studied, described, photographed and analyzed, with a view to a full preservation of all the data that could be accumulated about it. When the State Court, which is within the jurisdiction of this Court, took *custodia legis* of the *res* made the subject of this suit, it recognized that the plaintiffs here had voluntarily returned some of their articles to Austin, but required all articles to be returned. The State Court appointed an Inventory Committee and it was this Inventory Committee that brought the final artifacts to Texas.

■ This Court is aware of the ancient and important rule that where the property is in the actual possession of one Court of competent jurisdiction, such possession cannot be disturbed by any other Court, and if the State Court has first acquired custody, the Federal Court must decline jurisdiction. 1 Barron and Holtzoff, (Wright Ed.), Section 46.1, p. 245. However this rule does not apply when the subject matter of a suit involving the *res* is not subject to concurrent jurisdiction. The 28th Judicial District Court of Kennedy County, a Court within the jurisdiction of this Court, had *custodia legis* of the *res*, but as this Court maintained in its Memorandum of June 12, 1970, this Court, and this Court only, had jurisdiction to determine the salvage lien claimed by plaintiffs, something that the State Court could not do.

■ This Court did not disturb the *custodia legis* or possession of the State

Court, but in aid of this Court's jurisdiction enjoined the State Court from disposing of the *res* until further orders of this Court. An old Supreme Court case of ancient vintage, but still being cited with approval, Moran v. Sturges (1894), 154 U.S. 256, pp. 283–285, 14 S. Ct. 1019, 38 L.Ed. 981, is ample authority for this Court to have ignored the ancient rule above referred to.

█ No warrant of arrest out of this Court was necessary, for such warrant of arrest would have precipitated the collision between two Courts that the ancient rule above referred to and cited in Wright's Edition of Barron and Holtzoff was aimed to avoid. A Court that had *custodia legis* was enjoined by this Court from disposing of the *res* made the subject of this lawsuit until further orders of this Court, and the *res* was in this Court just as if the United States Marshal had gone to arrest the property, for the *res* was in custody of this Court from that point forward for the purpose of enforcing a maritime lien.

At the hearing on November 1, 1973, it was made known to the Court that the state suit in the 28th Judicial District Court of Kennedy County had been dismissed the day before by the State, with the costs charged against the State. This Court inquired of the First Assistant Attorney General of Texas if this action had been taken to defeat the jurisdiction of this Court, for if it had, this Court would have been forced to take further action on its injunction, but the Honorable State Assistant Attorney General assured the Court that the dismissal of the state suit was not for that purpose.

There is no question that this Court, as a United States District Court, has jurisdiction over a salvage maritime lien, and that only a Federal Court such as ours has that jurisdiction. The points raised by the State have to do more with which Federal Court should have taken cognizance of this action. The salvage operation took place and the *res* was first salvaged in this District. Since the artifacts found were of foreign vintage, the salvors entered them through Customs at Brownsville, Texas, in this District. As explained above, the *res* was transferred by the salvors to Indiana and then returned to Austin, Texas, in the Western District of Texas, in large part by the fraud explained above. This action, therefore, could have been brought in only three Federal District Courts: one in Indiana, the one in the Western District of Texas, and here. Taking the State's argument at face value, the suit could not have been brought in Indiana, because the *res* had left that jurisdiction. If it is in the Western District of Texas by fraud, it should not be brought there. There remains only this District and for the reasons above stated, this Court reiterates its jurisdiction over the subject matter. The salvage lien, if any, arose here in this District, and here it will be enforced.

The Plaintiffs, on the other hand, are re-urging to the Court their right to outright title to the *res* on some theory of "finders-keepers", claiming that this was abandoned property and have cited to the Court Schley v. Couch, 155 Tex. 195, 284 S.W.2d 333 (1955). They claim that the State of Texas does not have any right to claim this property as owner, as the owner was the government of Spain, and they have not appeared pursuant to the monition issued out of this Court. Short work can be made of this claim of the plaintiffs, for if they are not claiming a salvage or maritime lien, but instead are claiming outright ownership under the law of "finders-keepers", they have no business in this Court sitting as a Court in admiralty, but could have pursued their claims in the State suit filed in Kennedy County. The plaintiffs are attempting to bring this suit on the basis of diversity and amount. It should be further noted that if this was simply a title suit to the salvaged items, concurrent jurisdiction would then exist between the State Court of Kennedy County and this

Court, and since the State Court had taken custody of the salvaged items, this Court would have had to decline jurisdiction because of the rule above referred to. But this Court has already held that this is a true salvage claim by its Memorandum of June 12, 1970, and it will proceed on that basis.

Under the better view and what this Court believes to be the common law adopted by Texas and the United States, abandoned "wrecks of the sea", including both vessels and cargo, belong, on recovery, to the sovereign, unless claimed by the owner within a year and a day. 63 A.L.R.2d, p. 1376, § 5. This Court has no evidence of who owned the galleon that sank in 1554. It was either owned by the government of Spain or some private Spanish owner, but regardless, ownership reverted to the crown of Spain within one year and one day, and thence to Texas through the succession of governments. The fact that Texas had no statute such as Florida in the case of State by Ervin v. Massachusetts Co., 95 So.2d 902, 63 A.L.R.2d 1360, cert. den'd, 355 U.S. 881, 78 S.Ct. 147, 2 L.Ed.2d 112, makes no difference. The State of Texas had a perfect right to come into this Court and claim as owner the *res* involved in this lawsuit, for more than a year and a day had passed since the finding of the *res* when this lawsuit was filed. The claim of the plaintiffs that they should be granted outright title to all of the *res* involved here is denied.

At the hearing on November 1, 1973, the Court heard evidence as to the value of the goods salvaged by Plaintiffs. Testifying on the question of value was Mr. Mendel Peterson, who from 1948 until his retirement in 1973, held several curatorial and administrative positions with the Smithsonian Institute. His offered qualifications as an expert were more than adequate. He, like all others involved in this case, realized that the historic value of the articles recovered was priceless. The State offered the testimony of Miss B. Weingast, an appraiser for Sotheby Parke Bernet, Inc. The witness Peterson put a market value on the artifacts recovered at $294,618.00, and Miss Weingast a value of $98,157.00. After hearing both parties testify in person, noting their qualifications, their background and their knowledge of the subject matter, this Court believes that the appraisal of Mendel Peterson is more believable, and finds the market value of the salvaged items to be as he testified. His appraisal surely seems the more authoritative of the two, and more in line with a generally held view that these priceless finds by the salvors were worth millions of dollars. The Plaintiffs in this case are claiming that they spent a total of $139,301.80, in their salvage operations and their after-salvage costs. The State of Texas, on the other hand, is claiming that they spent some $200,000.00 in restoring the items to their present state and value. What the salvors have spent is something to be considered in arriving at their salvage lien, and it will be so considered. What the State claims in restoration costs is something else. The testimony of Mendel Peterson was to the effect that the most valuable items in the find needed no restoration, or very little if any, and that appraised items consisting of gold, silver, brass and bronze were not enhanced in value by the restoration, and this amounted to $241,082.00 of the total market value. There is no testimony before this Court that the State of Texas appropriated any special funds for the restoration claimed, but it was done by employees of the State under the regularly budgeted line item funds. While there is evidence that a building was constructed to take care of the restoration, this building will still remain to the State, and can be used for years to come in its archeological studies.

The witness Peterson gave extensive testimony regarding the effect of restoration on market value. On many items, as noted above, restoration did nothing to increase their value. Some of the

items needed extensive restoration. From his testimony, we can find that items which he testified were worth $53,536.00 and which required extensive restoration, were worth only forty (40%) per cent of the $53,536.00, at the water's edge. Taking his testimony, we can safely say that restoration by the State amounted to an increase in value of items salvaged of $32,122.00.

The State's contention that the cost of restoration and so forth and the value placed on it by its appraiser would make the *res* have no market value is totally without merit.

The market value of the salvaged items being $294,618.00, minus a reasonable restoration cost expended by the State of $32,122.00, is the true market value of the salvaged items when brought up by the salvors.

The remaining question is how much should this Court award to the salvors.

While the State of Texas and many others knew of the existence of the sunken Spanish galleons off the Texas coast, it took the plaintiffs here to bring up the items recovered. The galleon was at a place where the public could enter. Texas had no statute as it does now protecting them. This Court from the very beginning has thought that the parties in this case, the State of Texas through its then Land Commissioner and the plaintiffs themselves have always thought, that a fifty-fifty division was the correct measure of the salvage claim. Where the parties at interest have so agreed among themselves, this Court sees no reason why it should interfere, if the negotiations carried on amounted in the eyes of this Court, to a pre-determined contract of salvage, and therefore, this Court finds that the plaintiff-salvors are entitled to one-half of the value of $294,618.00, less one-half of the restoration costs, or a total award of $131,248.00.

The intervenors, Jefferson T. Burke and Billy Russell Algoe, both testified in this cause. They stand in the same shoes as Platoro, and apparently were working with Platoro, and are making claims for monies not yet received from Platoro, the plaintiff in this cause. Intervenor Burke is claiming $17,500.00, and Intervenor Algoe is claiming $6,000.00. From the evidence before me, I find that out of the salvage award of $131,248.00, the Intervenor Burke is entitled to the sum of $8,750.00, and the Intervenor Algoe is entitled to the sum of $3,000.00, for in this Court's view, they were sort of joint venturers with Platoro, and some of the claims made by them were actually in aid of the main salvor, Platoro, and services rendered to it, and not actually expended in the bringing up of the salvaged items, and at least one-half of the claims should have been for services rendered to Platoro and not on behalf of the salvaged items. In this Court's view, many of the items testified to by Burke and Algoe were included in the sum that the main salvor, Platoro, the plaintiff in this case, testified was spent by them in this salvage operation.

The State of Texas and some of those who appeared in this Court as *amicus curiae* in the past have expressed great desire in having the State keep the *res* in its museums. The State of Texas will, therefore, be given a reasonable time in which to pay this salvage award in cash. Failing in this, the salvaged items will be divided in kind following the value of the salvaged items as found by Mendel Peterson. If the parties cannot agree on the division, this Court will retain jurisdiction to appoint a Master to accomplish the task.

This Memorandum includes the Findings of Fact and Conclusions of Law of this Court, and is a Final Judgment.

The Clerk will send copies of this Memorandum and Order to counsel for the parties.