**PLATORO LIMITED, INC.**

v.

**The UNIDENTIFIED REMAINS OF A VESSEL, her cargo, apparel, tackle, and furniture in a cause of salvage, civil and maritime.**

**No. A–77–CA–112.**

United States District Court, W. D. Texas, Austin Division.

May 6, 1981.

Jack Sanchez, Brownsville, Gordon L. Briscoe, Harlingen, for plaintiff.

Connie Ode and Paul R. Gavia, Asst. Attys. Gen., Austin, Tex., James Parker, San Antonio, Tex., for defendant.

## MEMORANDUM OPINION AND ORDER

BUNTON, District Judge.

This is a proceeding in rem brought by Platoro, Ltd., Inc., Salvors, under the admiralty jurisdiction of this Court for title to the res found under the maritime law of finds or, alternatively, for title as a salvage award for services rendered in the recovery of certain artifacts from a 16th century Spanish galleon found in Texas' territorial gulf waters. The State of Texas appeared originally in this suit as an intervenor claiming title as owner by sovereignty. Jefferson T. Burke and Billy Russell Algoe also appear as intervenors, claiming also as salvors.

### I. *Introduction*

In 1967, Platoro located the wreck of the sunken galleon in navigable waters just off the coast of Texas. In September of 1967, salvors proceeded to remove 10 to 15 feet of sand covering the vessel and to recover some of its treasures. The State of Texas learned of Platoro's salvage efforts and, in December of 1967, was successful in obtaining an injunction in state court enjoining Platoro from further salvage operations. The matter has been in litigation ever since.

Platoro first filed this same cause of action for salvage in 1969 in the Southern District of Texas. Immediately prior to hearing in that court, the State dismissed its cause of action (under Texas Penal Code art. 147b) against Platoro in a state district court. In 1973, the Court in the Southern District entered judgment for Platoro, which the Fifth Circuit reversed and remanded with directions to dismiss for lack of jurisdiction. *Platoro Ltd., Inc. v. Unidentified Remains of a Vessel*, 371 F.Supp. 356 (S.D.Tex.1970), *reversed*, 508 F.2d 1113 (5th Cir. 1975).

In reversing the Court in the Southern District, the Fifth Circuit noted in dictum that the district court's disposition of the res (title to the State, recovery for salvage services to be had from the State) raised serious Eleventh Amendment questions.

Platoro, therefore, sought consent from the Texas Legislature to bring suit against the Treasury of Texas in the event that adjudication on the merits in the proper federal court would again result in Platoro's having to recover for its salvage services from the State. Consent was denied in the next legislative session; nevertheless, in 1976, Platoro again filed suit, this time in the Western District, ostensibly to toll the running of the statute of limitations. The Western District promptly dismissed the suit for want of jurisdiction, citing the Eleventh Amendment. This 1976 order was not appealed, but in May of 1977 Platoro was successful in obtaining the Legislature's permission to sue the State, and this suit was filed in June, 1977. In November, 1977, this Court, Judge Roberts presiding, held that the action was barred by the statute of limitations and dismissed the suit. In 1980 the Fifth Circuit reversed and remanded for a determination of the merits. *Platoro Ltd., Inc. v. Unidentified Remains of a Vessel*, 614 F.2d 1051. Trial on the merits was had in this court beginning on March 30, 1981.

## II. *Title*

■ In an in rem proceeding of this type, the salvor brings suit against the res salved to recover for his services. He has an automatic lien and a right to possession of the res against all others, including the owner. To execute his lien, the salvor files suit in a court of admiralty and other parties having claims to the res appear by way of intervention, declaring their claims to the res. The court reviews the interests claimed, orders the res sold by the Marshal at a public sale, and distributes the proceeds according to its findings on the various interests claimed.

In this suit, however, the State of Texas claimed it owned the res as a matter of law

and, therefore, Platoro's salvage claim against the State/owner was barred by the Eleventh Amendment.

■ The State asserted ownership of the sunken treasure ship under several theories. The first of these was the British common law doctrine of sovereign prerogative, which allows ownership of an abandoned wreck to revert to the sovereign a year and a day after abandonment by the true owner. Texas claimed under this theory by virtue of the succession of governments which owned the land in which the ship was found buried. This theory is without merit [1], but the Court is bound by the

---

1. The last transfer of sovereignty supposedly was the Submerged Lands Act of 1953, by which Congress released to Texas the extent of the federal government's ownership and control over the land submerged three leagues out into the Gulf of Mexico. The Act did not, however, purport to erode maritime law which governs any activity relating to navigation or commerce on navigable waters.

Historically, federal courts sitting in admiralty have had jurisdiction in actions concerning salvage where the service has been performed on navigable waters and operated to reintroduce items of value to streams of commerce. To read the Act to encroach upon traditional maritime jurisdiction would present a conflict of laws of constitutional dimension. Salvage service is performed upon and in navigable waters and is unrelated to law governing the submerged land beneath those waters. Conceivably, the owner of the submerged land could have an action in trespass against a salvor who was disturbing the submerged land, but action for trespass would have to arise from a state statute specifically setting forth the proscribed activity. Texas proffered its own statute governing submerged lands which in 1967 read: "Unauthorized encroachment upon and use of the submerged lands and islands owned by the state shall be prevented...." Tex.Rev.Civ.Stat.Ann. art. 5415e, § (1)(c) (as it existed in 1967). Reading further, however, the statute defines submerged lands to *exclude* "land within the jurisdiction of the State of Texas which lies beneath the open waters of the Gulf of Mexico." *Id.* at § (2)(e). Hence, that statute does not control.

Texas next proffered another statute from the same chapter governing public lands, Art. 5421 T.R.C.S., which says that the Land Commissioner shall report to the Attorney General the names of persons who have appropriated any property of value from public lands, and the Attorney General shall bring suit for the value of such property in the county where the

injury occurs. No such suit was filed by the Attorney General, and this Court sitting in admiralty has no jurisdiction over such claim.

The third statute Texas urged was Art. 147b of the Texas Penal Code which regulates the exploration for archaeological objects within the State of Texas. This statute was passed before any of the submerged Gulf lands became part of Texas; obviously, the Texas Legislature never intended it to apply to digs in the submerged Gulf lands. Moreover, it is not clear from the statute that the salvaging of a sunken ship is an excavation of an archaeological site. In order to withstand constitutional muster, the statute would have to more specifically proscribe the salvaging of buried treasure ships.

Assuming arguendo that the Texas Legislature intended for the statute to apply to excavations of sunken ships, the law of Texas regarding finds precludes the State from claiming title to the find. *Schley v. Couch*, 284 S.W.2d 333 (Tex.1915). In Texas, according to *Schley*, the finder of lost buried property is keeper. Other jurisdictions distinguish between lost property and lost property found embedded in the soil. *See Burdick v. Chesebrough*, 88 N.Y.S. 13, 94 A.D. 532 (1904) (earthenware found embedded in soil), *Allred v. Biegel*, 219 S.W.2d 665 (Mo.App.1949) (ancient Indian canoe embedded in river bank) and *Elwes v. Brigg Gas Co.*, 33 Chancery Division English Law Reports 562 (1886) (prehistoric boat found buried in mud). Texas, however, does not. Therefore, even according to Texas common law, the finder of buried treasure is keeper.

It is the Court's impression at this time that the State's intervention in this suit has been misconceived ab initio; the State of Texas, by claiming title by sovereign prerogative, has ignored the fact that the British common law doctrine of sovereign prerogative has been absorbed into the law of admiralty; the courts sitting in admiralty take the res into their registries, as did the British sovereign, and disburse

doctrine of res judicata to rule as though it were the law.

In 1976, this Court, speaking through Judge Roberts, entered an order awarding title to the State of Texas by virtue of its sovereignty, dismissing Platoro's salvage claim as jurisdictionally barred by the Eleventh Amendment. That order was not appealed, apparently because the Fifth Circuit had already indicated that a salvage suit against the State had Eleventh Amendment problems. Platoro did not oppose the State's Motion to Dismiss nor did it appeal the order which reached and adjudicated the substantive issue of title which was an essential prerequisite to the dismissal for want of jurisdiction. *See Kerbow v. Kerbow,* 421 F.Supp. 1253 (N.D.Tex.1976). Therefore, regardless of the accuracy of the application of the law reflected in that order, this Court is precluded from applying the maritime law of finds as recently enunciated by the Fifth Circuit in a very similar and instructive case, *Treasure Salvors, Inc. v. The Unidentified Wrecked & Abandoned Sailing Vessel,* 569 F.2d 330 (5th Cir. 1978).[2]

The Court is aware of authorities which imply that res judicata is not an absolute bar where between the time of the first and second judgments an important new decision alters the state of the law. *State Farm Mutual Automobile Ins. Co. v. Duel,* 324 U.S. 154, 65 S.Ct. 573, 89 L.Ed. 812 (1945). None of the cases which follow that line of authority appear to involve a party who actually failed to appeal an appealable judgment, and this Court declines to reach for an exotic exception to the doctrine of res judicata when Platoro failed to assert its rights at the proper time.

An interesting hypothesis that the Court does not endorse at this point is that Texas' ownership of the res (by virtue of the doctrine of res judicata) does not preclude application of the maritime law of finds in

awarding the res to the salvor. Norris suggests in his treatise on admiralty that an owner may lose or abandon his property without being deprived of his title to it. Therefore, if the State insists that it has title to the res, the Court could find that the State had abandoned the res (by never exerting any control or otherwise indicating possession of the res), and the finder of the abandoned[3] property gets to keep the find. The Court finds it unnecessary to indulge this hypothesis, since the same result is reached by following a clearer path.

Although consideration of the title question is barred, the salvage lien is not barred because in 1977 Platoro did succeed in obtaining the Texas Legislature's consent to sue the State on its salvage lien and immediately filed this lawsuit. The jurisdictional defect was cured. *See* 49 A.L.R.2d 1036, at § 6(c) and cases cited therein.

### III. *The Salvage Award*

The dispute as to whether this is a valid salvage claim was fully explicated previously by Judge Garza when the case was before him in the Southern District. 371 F.Supp. 351 (1970). The three elements of a valid salvage claim are:

(1) that marine peril exists;

(2) that the service was voluntarily rendered; and

(3) that the effort was successful in whole or in part.

*Legnos v. M/V Olga Jacob,* 498 F.2d 666 (5th Cir. 1974).

The State claims that the res was in no marine peril. We dispose of this contention by noting that the res was lost and had been lost for four centuries when it was discovered by Platoro. Texas' claim that the ship was *not* lost is based on the fact that authorities knew the "general vicinity" of the vessel; when put to closer examina-

---

the expense for salvage and other costs concerning the res as they are claimed or incurred. The State of Texas has tried relentlessly to divest this Court of its admiralty jurisdiction by asserting its claims of sovereignty. This effort misconstrues the laws of admiralty.

**2.** The maritime law of finds is well established in American courts. *See* cases cited in *Treasure Salvors* and 63 A.L.R.2d 1369.

**3.** The Court recognizes that this is a fiction since the State never "possessed" the res to lose it.

tion, this assertion amounted to a suspicion that it lay somewhere between Brownsville and Corpus Christi, Texas, or within a 150-mile expanse. Actual loss and subjection to the elements constitutes "marine peril" for the purpose of making a valid salvage claim. *See Thompson v. One Anchor and Two Chains*, 221 F. 770 (W.D.Wis.1915).

■ There is no exact measure to determine the amount of a salvage award. Comparable cases may be referred to but cannot serve as a rigid yardstick, *The Neto and Cargo*, 15 F. 819 (D.Fla.1883); the common law rule of moiety has been "long exploded," *Taylor v. The Cato*, 23 F.Cas. 13,786 (D.Pa.1806); and fixed percentages are not always equitable, *The Craster Hall*, 213 F. 436 (5th Cir. 1914); *see also Post v. Jones*, 19 How. 150, 60 U.S. 150, 15 L.Ed. 618 (1856).

■ Public policy has long mandated a liberal salvage award so that a salvor, recognizing a vessel in distress, will have the pecuniary incentive to prompt his efforts. *The Missouri*, 17 F.Cas. 9654 (D.Mass.1854) and *Seven Coal Barges*, 21 F.Cas. 12,677 (C.C.Ind.1870). The practicality underlying the policy of encouragement is that, unless seamen are encouraged to go to the aid of disabled vessels, property and sometimes life will be needlessly lost. *The Morzhovoi*, 20 F.2d 265 (D.Wash.1927).

The elements considered by most courts in arriving at an award for salvage service are:

1. the degree of danger from which the lives and property are rescued;
2. the value of the property saved;
3. the risk incurred by the salvors in securing the property from the impending peril;
4. the promptitude, skill and energy displayed by the salvors in rendering the service and saving the property;
5. the value of the property employed by the salvors in rendering the service and the danger to which such property was exposed; and
6. the time and labor expended by the salvors in rendering the salvage services.

Norris, 3A Benedict on Admiralty, *The Law of Salvage*, 7th ed, § 244.

1. *The Degree of Danger from Which the Property was Rescued*

The State's contention that the vessel was safely embedded in and even preserved by the 10–15 foot layer of sand is not at all compelling. Platoro had no way of knowing how well preserved the vessel and its cargo would be—if and when it was found. When Platoro researched the location of the ship and even when engaged in removing the sand, it had no inkling that the sand and water would have the preserving effect they had. Moreover, Platoro had no real reason to believe that the treasure cargo was not scattered all over the floor of the Gulf, rather than collected and reposed as it actually was. The Gulf is renowned for its ferocious hurricanes which threaten annually. This obvious danger has an effect on the topography of the sea floor, as several of Platoro's witnesses testified from personal experience.

■ The State's contention that the salved goods were in no danger and were exposed to no "marine peril" is based on hindsight and ignores the obvious problem that the goods were absolutely lost. The fact that the sand and salt water preserved the goods is a boon rather than a bar to a salvage claim. In addition, there was testimony that extensive seismic operations have been conducted in this area. Drilling operations for oil and gas are ongoing activities. Obviously, these exploratory procedures in the quest for oil and gas might well have caused all the artifacts to be destroyed or scattered so that they never would be recovered.

It is noted that the *Santa Maria*, a sister ship of the *Espiritu Santu* (the Platoro find), sank a few scant miles away. The Corps of Engineers in constructing the channel for Port Mansfield dug right through the remains of this ship and destroyed many artifacts and ruined many others.

2. *The Value of the Property Saved*

Both Platoro and the State put on evidence of the value of the artifacts salved.

Platoro's experts were current in their knowledge of the field of marine artifacts and based their estimates on commercial value both at the time of the find and presently. Particularly was the Court impressed (as was Judge Garza at the trial in the Southern District) by the testimony of Mendel Peterson who evaluated the market value of the metal artifacts (before the State's restoration) at $241,082.00. Another credible witness testified that the market value of the armaments (presumably the non-metal artifacts) was approximately $26,000.00.

In addition, the State's witnesses testified extensively to the great contribution this find made to the fields of history and marine archaeology. The State, of course, did not assign a dollar figure to such value.

### 3. The Risk Incurred by the Salvors

The salvors testified concerning the varied dangers to which they were exposed during the salvage operation: severe undertow, fish of the deep, inclement surface weather, and the danger of the salving vessel's propeller in conjunction with the use of the deflection shield. This testimony was virtually uncontroverted.

### 4. The Promptitude, Skill & Energy in Rendering the Service

This element is the least applicable to Platoro's salvage service since promptitude is relative to the necessity for promptitude; however, the evidence was that Platoro's crew was diligent in its efforts, stopping its operation only when the weather and the State so dictated. Most of the salvors were experienced divers, and several were experienced salvors. This Court declines to hold them to the standard of expertise required of marine archaeologists, as the State has urged.

### 5. The Value of the Property Employed by the Salvors and the Danger to Which It was Exposed

The salvors put on evidence that, to move the thick layer of land covering the vessel, they designed and used special innovative equipment which has been successfully copied and used in other salvage efforts. Witnesses testified that the equipment they used was standard salvaging equipment used in Gulf salvage operations. The equipment was not exposed to any extraordinary danger (other than hurricane Beulah).

### 6. The Time and Labor Expended by Salvors

Platoro submitted a reasonable estimate of the man-hours and equipment-hours expended in the salvage effort, totaling approximately $140,000.00 to which Platoro is entitled plus 9% prejudgment interest dating from the time Texas took the res. See M/V Vulcan, 553 F.2d 489 (5th Cir. 1977).

Intervenors Burke and Algoe submitted similarly reasonable estimates of their time, but, although they were party to the salvage effort from the beginning, their claim is impeded by the doctrine of collateral estoppel and an Eleventh Amendment jurisdictional bar. The 1977 legislative consent to sue the State extends only to Platoro. Algoe and Burke were independent salvors and did not obtain consent to sue the State.

In addition, the Court concludes that Intervenors' claim is barred by the statute of limitations. If Intervenors' claim for a salvage award was independent of Platoro's claim, as they claim, Intervenors did nothing to pursue the merits of their cause of action from 1976 until July, 1980, when they moved to intervene in this lawsuit. The statute of limitations precludes Intervenors from pursuing a cause of action at this late date. 46 U.S.C. § 730. The considerations which allowed Platoro to sue in spite of 46 U.S.C. § 730 do not apply to Intervenors. See Platoro v. Unidentified Remains, 614 F.2d 1051, 1055 (5th Cir. 1980).

Although the Court has judicial power to toll statutes of limitations on equitable grounds, the Court declines to do so where

the parties have so apparently abandoned their claims and where their conduct indicates quite clearly that they considered themselves in privity with Platoro as Platoro's agents and therefore bound by the 1976 order.

IV. *Conclusion*

Based on the above facts and underlying policy considerations, the Court finds that Platoro's adequate and just salvage award is equal to or perhaps in excess of the sum which a sale would bring. Therefore, it will allow the State to satisfy judgment by relinquishing title of the res to Platoro. If the State chooses not to follow this suggestion, the Court will order a public sale of the res and will award the entire proceeds of sale to Platoro, less court costs and costs of sale. *Accord, Brady v. The SS African Queen,* 179 F.Supp. 321 (D.Va. 1960). Such an award is not excessive in view of the great historical and archaeological value the State's witnesses attributed to the find. The salvors should be amply rewarded.

The State has asked for an offset for its time and expense in restoring the artifacts after they were recovered from Platoro. The Court can find no precedent for this type of claim on an action for salvage and, therefore, holds that it is without jurisdiction to consider it. Even if the claim for offset sounded in admiralty, the Court would be reluctant to grant it since the State has had the artifacts in its exclusive possession and control since 1969.

There remains only the issue of attorney's fees. The award of attorney's fees in admiralty actions is discretionary and is specifically permitted in salvage cases. *See Compania Galeana, S.A. v. Motor Vessel CARRIBBEAN,* 565 F.2d 358 (5th Cir. 1978). Particularly here, where the State has refused to negotiate or recognize a valid salvage claim, is an award of attorney's fees appropriate. Therefore, Platoro is entitled to recover $63,800.00 in attorney's fees and court costs.

IT IS SO ORDERED.